Corrigan, C.J.
In this declaratory action, we must determine: (1) whether House Concurrent Resolution (HCR) 115 (1998), the Legislature’s approval by resolution of tribal-state gaming compacts, constituted “legislation” and therefore violated Const 1963, art 4, § 22; (2) whether the compacts’ amendatory provision providing that the Governor may amend the compacts without legislative approval violates the separation of powers doctrine found in Const 1963, art 3, § 2; and (3) whether HCR 115 is a local act in violation of Const 1963, art 4, § 29.
We hold that the Legislature’s approved of the compacts through HCR 115 did not constitute legislation. In approving those compacts by resolution, the Legislature did not modify Michigan law in any respect; instead, the Legislature simply expressed its approval of valid contracts between two independent, sovereign entities. Although Michigan’s gaming law would have applied to gaming on tribal lands in the absence of a tribal-state compact, it applied only as a matter of *313 federal law. Compacts establishing the terms of class III gaming on tribal lands modified only federal law. Therefore, our Constitution does not require that our Legislature express its approval of these compacts through bill rather than resolution.
We further hold that although the issue of the amendment provision in the compacts may now be ripe for review, the lower courts have yet to review this issue and make any specific findings regarding whether the amendatory provision in the compacts, as now invoked by Governor Granholm, violates the separation of powers provisions found in Const 1963, art 3, § 2. Finally, we hold that HCR 115 is not a “local act” and therefore does not violate Const 1963, art 4, § 29. Accordingly, we remand the amendment provision issue to the Court of Appeals for consideration, but otherwise affirm the decision of the Court of Appeals.
I. FACTUAL history and procedural posture
A. BACKGROUND: FEDERAL LAW REGARDING TRIBAL GAMING
Knowledge of the underlying federal law is necessary to understand the factual posture of this case. In California v Cabazon, 480 US 202, 207; 107 S Ct 1083; 94 L Ed 2d 244 (1987), the United States Supreme Court held that state laws may only be applied to tribal lands “if Congress has expressly so provided.” The Court held that because Congress had not provided for the regulation of tribal gaming, a state could only prohibit gaming on tribal lands if the state completely prohibited all gaming within its borders.
In response to Cabazon, Congress passed the Indian Gaming Regulatory Act (IGRA), 25 USC 2701 et seq., which divides gaming activities into three classes. Class I gaming consists of “social games solely for prizes of *314 minimal value or traditional forms of Indian gaming engaged in by individuals as a part of, or in connection with, tribal ceremonies or celebrations.” 25 USC 2703(6). Class II gaming includes bingo and card games (but not banking card games) that are played in conformance with state laws and regulations regarding hours of operation and limitations on wagers or pot sizes. 25 USC 2703(7). Class III gaming includes all other forms of gambling, including casino gaming. 25 USC 2703(8).
At issue in this case is class HI gaming. Under IGRA, tribes may engage in class III gaming only pursuant to a tribal-state compact that is approved by the Secretary of the Interior. 25 USC 2710(d) provides, in relevant part:
(1) Class III gaming activities shall be lawful on Indian lands only if such activities are—
(B) located in a State that permits such gaming for any purpose by any person, organization, or entity, and
(C) conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State under paragraph (3) that is in effect.
(3) (A) Any Indian tribe having jurisdiction over the Indian lands upon which a class III gaming activity is being conducted, or is to be conducted, shall request the State in which such lands are located to enter into negotiations for the purpose of entering into a Tribal-State compact governing the conduct of gaming activities. Upon receiving such a request, the State shall negotiate with the Indian tribe in good faith to enter into such a compact.[1]
*315 (C) Any Tribal-State compact negotiated under sub-paragraph (A) may include provisions relating to —
(i) the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity;
(ii) the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations;
(iii) the assessment by the State of such activities in such amounts as are necessary to defray the costs of regulating such activity;
(iv) taxation by the Indian tribe of such activity in amounts comparable to amounts assessed by the State for comparable activities;
(v) remedies for breach of contract;
(vi) standards for the operation of such activity and maintenance of the gaming facility, including licensing; and
(vii) any other subjects that are directly related to the operation of gaming activities.
(5) Nothing in this subsection shall impair the right of an Indian tribe to regulate class III gaming on its Indian lands concurrently with the State, except to the extent that such regulation is inconsistent with, or less stringent than, the State laws and regulations made applicable by any Tribal-State compact entered into by the Indian tribe under paragraph (3) that is in effect.
Through § 2710(d), Congress expressly provided for tribal-state negotiations regarding class III gaming. *316 Through this compacting process, the tribes and the states may agree to the terms governing such gaming.
B. FACTUAL HISTORY
The compacts at issue in this case were first signed by Governor Engler and four Indian tribes[2] in January of 1997. Each compact provided that it would take effect after “ [endorsement by the Governor of the State and concurrence in that endorsement by resolution of the Michigan Legislature.”[3] The compacts were modified and re-executed in December 1998, and the Legislature then approved the compacts by resolution through HCR 115.[4]
The validity of the 1998 compacts was challenged through several lawsuits.[5] Plaintiffs filed this suit against defendant in the Ingham Circuit Court, seeking a declaratory judgment that the compacts do not comport with various constitutional provisions. Plaintiffs *317 argue that the compacts amount to legislation and, therefore, pursuant to Const 1963, art 4, § 22 the Legislature was required to adopt them by bill rather than approve them by resolution. The circuit court held that the compacts should have been approved by bill. The Court of Appeals reversed the circuit court decision, concluding that the compacts do not constitute legislation because they contain no enforcement provision that would ensure that their terms are satisfied and because the power of the state to legislate in this area is preempted by federal law. The Court of Appeals opined that the compacts constitute mere contracts and, therefore, approval by resolution was not constitutionally infirm.
Plaintiffs also contend that the provision in the compacts that purports to empower the Governor to amend them without legislative approval violates Const 1963, art 3, § 2, the “separation of powers” doctrine. The circuit court agreed with plaintiffs. The Court of Appeals, however, reversed the decision of the circuit court on the basis that the amendatory provision issue was not ripe for review because the Governor had not yet attempted to amend the compacts.
Plaintiffs further argue that the compacts violate Const 1963, art 4, § 29, the “local acts” clause. The circuit court disagreed, holding that art 4, § 29 is not implicated. The Court of Appeals agreed and affirmed the circuit court on this issue.
This Court granted leave to appeal.
II. STANDARD OF REVIEW
This Court reviews de novo a trial court’s decision regarding a motion for summary disposition. Van v Zahorik, 460 Mich 320, 326; 597 NW2d 15 (1999). The *318 constitutionality of a legislative act is a question of law that is reviewed de novo. DeRose v DeRose, 469 Mich 320, 326; 666 NW2d 636 (2003).
III. THE LEGISLATURE’S APPROVAL OF THE COMPACTS WAS NOT LEGISLATION
Resolution of whether HCR 115 constituted legislation necessarily turns on the definition of “legislation.” Plaintiffs argue that the Legislature’s approval of the compacts must be legislation because HCR 115 had the effect of altering legal rights and responsibilities. We find this definition of “legislation” overly simplistic. Although it is true that legislation alters legal rights and responsibilities, not everything that alters legal rights and responsibilities can be considered legislation. Legal rights and responsibilities may also be altered through contracts. Therefore, the fact that the legal rights or responsibilities of the parties involved may have been altered in some way is not dispositive.
We hold that a more accurate definition of “legislation” is one of unilateral regulation. The Legislature is never required to obtain consent from those who are subject to its legislative power. Boerth v Detroit City Gas Co, 152 Mich 654, 659; 116 NW 628 (1908). This unilateral action distinguishes legislation from contract: “ ‘The power to regulate as a governmental function, and the power to contract for the same end, are quite different things. One requires the consent only of the one body, the other the consent of two.’ ” Detroit v Michigan Pub Utilities Comm, 288 Mich 267, 288; 286 NW 368 (1939), quoting City of Kalamazoo v Kalamazoo Circuit Judge, 200 Mich 146, 159-160; 166 NW 998 (1918).
Here, the Legislature was required to approve the compacts only as the result of negotiations between two *319 sovereigns: the Legislature could not have unilaterally exerted its will over the tribes involved. Because the tribes’ consent is required by federal law, the compacts can only be described as contracts, not legislation.
A. THE STATE’S LIMITED ROLE UNDER IGRA
In order to understand the contractual nature of the compacts, it is essential to understand the state’s limited role under federal law generally, as well as IGRA. Since at least 1832, the United States Supreme Court has recognized tribal sovereignty. In Worcester v Georgia, 31 US 515, 557; 8 L Ed 483 (1832), the United States Supreme Court noted that the tribes were “distinct political communities, having territorial boundaries, within which their authority is exclusive, and having a right to all the lands within those boundaries, which is not only acknowledged, but guarantied by the United States.” This tribal sovereignty is limited only by Congress: “The sovereignty that the Indian tribes retain is of a unique and limited character. It exists only at the sufferance of Congress and is subject to complete defeasance.” United States v Wheeler, 435 US 313, 323; 98 S Ct 1079; 55 L Ed 2d 303 (1978). Similarly, only the federal government or the tribes themselves can subject the tribes to suit; tribal immunity “is not subject to diminution by the States.” Kiowa Tribe of Oklahoma v Mfg Technologies, Inc, 523 US 751, 754, 756; 118 S Ct 1700; 140 L Ed 2d 981 (1998). Through IGRA, however, Congress has permitted the states to negotiate with the tribes through the compacting process to shape the terms under which tribal gaming is conducted. The states have no authority to regulate tribal gaming under the IGRA unless the tribe explicitly consents to the regulation in a compact.
*320 Although 25 USC 2710(d)(1)(C) provides that class III gaming activities are only lawful if conducted in conformance with a tribal-state compact, that does not mean the states have any authority to regulate class III gaming activities in the absence of a compact. States may not enforce the terms of IGRA; rather, the only enforcement provided for in the IGRA is through the federal government. The IGRA provides that civil enforcement lies only with the tribes themselves or with the National Indian Gaming Commission, which was created by IGRA. 25 USC 2713. Judicial review of the Commission’s decision may only be obtained in federal court. 25 USC 2714. Similarly, criminal enforcement is left solely to the federal government under 18 USC 1166(d). See also Gaming Corp of America v Dorsey & Whitney, 88 F3d 536, 545 (CA 8, 1996) (“Every reference to court action in IGRA specifies federal court jurisdiction.... State courts are never mentioned.”). In other words, although it may be “unlawful” for the tribes to engage in class III gaming absent a compact, the Legislature is powerless to regulate or prohibit such gaming. State legislatures have no regulatory role under IGRA aside from that negotiated between the tribes and the states.
In Gaming Corp, supra at 546-547, the court explained:
Congress thus left states with no regulatory role over gaming except as expressly authorized by IGRA, and under it, the only method by which a state can apply its general civil laws to gaming is through a tribal-state compact. Tribal-state compacts are at the core of the scheme Congress developed to balance the interests of the federal government, the states, and the tribes. They are a creation of federal law, and IGRA prescribes “the permissible scope of a Tribal-State compact, see § 2710(d)(3)(C).” Seminole Tribe of Florida v Florida [517 US 44; 116 S Ct 1114; 134 *321 L Ed 2d 252 (1996).] Such compacts must also be approved by the Secretary of the Interior. § 2710(d)(3)(B).
Congress thus chose not to allow the federal courts to analyze the relative interests of the state, tribal, and federal governments on a case by case basis. Rather, it created a fixed division of jurisdiction. If a state law seeks to regulate gaming, it will not be applied. If a state law prohibits a class of gaming, it may have force. The courts are not to interfere with this balancing of interests, they are not to conduct a Cabazon balancing analysis. This avoids inconsistent results depending upon the governmental interests involved in each case. With only the limited exceptions noted above, Congress left the states without a significant role under IGRA unless one is negotiated through a compact.
The only way the states can acquire regulatory power over tribal gaming is by tribal consent of such regulation in a compact.
In fact, our Legislature has recognized that the state’s regulatory authority cannot extend to tribal gambling. MCL 432.203(5) provides that state regulation of tribal casinos can only occur “[i]f a federal court or agency rules or federal legislation is enacted that allows a state to regulate gambling on Native American land.” Absent such federal authorization, MCL 432.203(2)(d) acknowledges that the state’s gambling regulatory requirements do not apply to “[g]ambling on Native American land and land held in trust by the United States for a federally recognized Indian tribe on which gaming may be conducted under [IGRA].”
Further, contrary to plaintiffs’ contentions, 18 USC 1166 does not change this analysis. Section 1166 provides:
*322 (a) Subject to subsection (c), for purposes of Federal law, all State laws pertaining to the licensing, regulation, or prohibition of gambling, including but not limited to criminal sanctions applicable thereto, shall apply in Indian country in the same manner and to the same extent as such laws apply elsewhere in the State.
(b) Whoever in Indian country is guilty of any act or omission involving gambling, whether or not conducted or sanctioned by an Indian tribe, which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the State in which the act or omission occurred, under the laws governing the licensing, regulation, or prohibition of gambling in force at the time of such act or omission, shall be guilty of a like offense and subject to a like punishment.
(c) For the purpose of this section, the term “gambling” does not include—
(1) class I gaming or class II gaming regulated by the Indian Gaming Regulatory Act, or
(2) class III gaming conducted under a Tribal-State compact approved by the Secretary of the Interior under section 11(d)(8) of the Indian Gaming Regulatory Act [25 USC 2710(d)(8)] that is in effect.
(d) The United States shall have exclusive jurisdiction over criminal prosecutions of violations of State gambling laws that are made applicable under this section to Indian country, unless an Indian tribe pursuant to a Tribal-State compact approved by the Secretary of the Interior under section 11(d)(8) of the Indian Gaming Regulatory Act [25 USC 2710(d)(8)], or under any other provision of Federal law, has consented to the transfer to the State of criminal jurisdiction with respect to gambling on the lands of the Indian tribe. [Emphasis added.]
Section 1166 does not grant the state regulatory authority over tribal gaming; rather, it simply incorporates state laws as the federal law governing nonconforming tribal gaming. Thus, although a state’s gaming laws apply in the absence of a tribal-state compact, they *323 apply only as federal law. It follows that when the Legislature approves a tribal-state compact, it approves a change in federal law rather than its own.
Moreover, this “federalization” of state law regulating gambling does not give a state enforcement power over violations of state gambling laws on tribal lands because “the power to enforce the incorporated laws rests solely with the United States.” United Keetoowah Band of Cherokee Indians v Oklahoma, 927 F2d 1170, 1177 (CA 10, 1991). The state remains powerless to assert any regulatory authority over tribal gaming unless the tribes have assented to such authority in a compact under IGRA. AT&T Corp v Coeur D’Alene Tribe, 295 F3d 899, 909 (CA 9, 2002).
Although 18 USC 1166(d) effectively “borrows” Michigan law for purposes of federal law, it does not delegate any regulatory power to the states. Section 1116(d) is not a way to extend the state’s power to regulate tribes through the federal government. Rather, the federal government may conclude at any time that it will no longer apply state law and so amend the IGRA. In other words, the fact that, for purposes of expediency, the federal government has currently chosen to apply Michigan law for purposes of federal law does not mean that it will always choose to do so. Therefore, § 1166(d) cannot be viewed as a delegation of regulatory power to the states.
B. THE CONTRACTUAL NATURE OF COMPACTS
As explained above, IGRA only grants the states bargaining power, not regulatory power, over tribal gaming. The Legislature is prohibited from unilaterally imposing its will on the tribes; rather, under IGRA, it must negotiate with the tribes to reach a mutual *324 agreement.[6] As further noted above, the hallmark of legislation is unilateral imposition of legislative will. Such a unilateral imposition of legislative will is completely absent in the Legislature’s approval of tribal-state gaming compacts under IGRA.. Here, the Legislature’s approval of the compacts follows the assent of the parties governed by those compacts. Thus, the Legislature’s role here requires mutual assent by the parties — a characteristic that is not only the hallmark of a contractual agreement but is also absolutely foreign to the concept of legislating. Rood v Gen Dynamics Corp, 444 Mich 107, 118; 507 NW2d 591 (1993). See Confederated Tribes of the Chehalis Reservation v Johnson, 135 Wash 2d 734, 750; 958 P2d 260 (1998) (“Tribal-state gaming compacts are agreements, not legislation, and are interpreted as contracts.”).
Further, the compacts approved by HCR 115 do not apply to the citizens of the state of Michigan as a whole; they only bind the two parties to the compact. Legislation “ ‘looks to the future and changes existing conditions by making a new rule to be applied thereafter to all or some part of those subject to its power.’ ” Dist of Columbia Court of Appeals v Feldman, 460 US 462, 477; 103 S Ct 1303; 75 L Ed 2d 206 (1983), quoting Prentis v Atlantic Coast Line Co, 211 US 210, 226; 29 S Ct 67; 53 L Ed 150 (1908). Here, the compacts approved by HCR 115 have no application to those subject to legislative power; rather, they only set forth the parameters within which the tribes, as sovereign nations, have agreed to operate their gaming facilities. Under the *325 terms of the compacts, the tribes themselves, not the state, regulate the conduct of class III gaming on tribal lands. The Legislature has no obligations regarding the regulation of gaming whatsoever, nor can the state unilaterally rectify a violation of the compacts.
Similarly, in approving the compacts at issue here, the Legislature has not dictated the rights or duties of those other than the contracting parties. Despite plaintiffs’ arguments to the contrary, we find that § 18 of the compacts does not obligate local units of government to create local revenue sharing boards. Indeed, because the local government units are not parties to the contract, it would not be possible for the compacts to impose any obligations on the local governments. Third parties cannot be bound by the terms of the compacts. Instead, the compacts make local units of government third-party beneficiaries of the compacts, with the creation of the revenue sharing boards simply a condition precedent to receiving those benefits. A party is a third-party beneficiary if the promisor “has undertaken to give or do or refrain from doing something directly to or for said person.” MCL 600.1405(1). Here, the tribes have promised to give 2% of their net earnings to local communities, provided those communities create the revenue sharing boards to receive and disburse the payments. If the local governments choose not to create the sharing boards, they simply can no longer receive the benefit of the funds. But they are under no obligation to create the revenue sharing boards and receive the benefit granted by the tribes.
Further, we reject plaintiffs’ argument that the Legislature’s approval by resolution has affected the rights of state citizens by setting age limitations for gaming or employment in the tribal casinos. These restrictions are not restrictions on the citizens of Michigan; rather, they *326 are restrictions only on the tribes. The compacts provide the minimum requirements that the tribes agree to use in hiring and admitting guests to the casinos. The state has no power to regulate the casinos or enforce violations of the compact, but must use the dispute resolution procedure provided in the compacts if a violation occurs.
Finally, we hold that the Legislature’s approval of the tribal-state compacts does not create any affirmative state obligations. The compacts do not create any state agencies or impose any regulatory obligation on the state. The state also has no responsibility to enforce the compacts’ requirements — that responsibility falls on the tribes alone. In this way, the compacts here can be distinguished from those at issue in the cases relied upon by plaintiffs. In Kansas v Finney, 251 Kan 559; 836 P2d 1169 (1992), the compact at issue created a state gaming agency responsible for monitoring the tribe’s compliance with the contract, and the compact was not submitted to the legislature for any form of approval. The court found that, under Kansas law, the creation of a state agency was a legislative function. Absent an appropriate delegation of power by the legislature or legislative approval of the compact,,[7] the compacts could not bind the state to the increased obligations. Unlike the compact in Finney, however, the compacts at issue here do not create any state agencies and were presented to the Legislature for approval.
Similarly, in New Mexico v Johnson, 120 NM 562; 904 P2d 11 (1995), the compacts authorized more forms of gaming than were otherwise permitted in New Mexico. As in Finney, the compacts were not presented to the state legislature for any form of approval. The court *327 held that the governor could not enter into the compacts and thereby create new forms of gaming without “any action on the part of the legislature.” Id. at 574. Unlike the compacts in Johnson, the compacts here do not create new forms of gaming and were presented to the Legislature for approval. Thus, the compacts do not impose new obligations on the citizens of the state subject to the Legislature’s power; they simply reflect the contractual terms agreed to by two sovereign entities.
C. LEGISLATIVE APPROVAL VIA RESOLUTION WAS APPROPRIATE
Once it is determined that HCR 115 did not constitute legislation, we must then determine whether resolution was an appropriate method of legislative approval of the compacts. We therefore turn to our Constitution. Our Constitution does not prohibit the Legislature from approving contracts, such as the compacts at issue here, by concurrent resolution. Unlike the federal constitution, our Constitution “is not a grant of power to the legislature, but is a limitation upon its powers.” In re Brewster Street Housing Site, 291 Mich 313, 333; 289 NW 493 (1939). Therefore, “the legislative authority of the state can do anything which it is not prohibited from doing by the people through the Constitution of the State or the United States.” Attorney General v Montgomery, 275 Mich 504, 538; 267 NW 550 (1936). This has been discussed by this Court in the past by analogizing our Legislature to the English Parliament. See Young v City of Ann Arbor, 267 Mich 241, 243; 255 NW 579 (1934), in which this Court stated:
A different rule of construction applies to the Constitution of the United States than to the Constitution of a State. The Federal government is one of delegated powers, *328 and all powers not delegated are reserved to the States or to the people. When the validity of an act of congress is challenged as unconstitutional, it is necessary to determine whether the power to enact it has been expressly or impliedly delegated to congress. The legislative power, under the Constitution of the State, is as broad, comprehensive, absolute and unlimited as that of the parliament of England, subject only to the Constitution of the United States and the restraints and limitations imposed by the people upon such power by the Constitution of the State itself.[8]
Regarding any limitations in our constitution, art 4, § 22 only requires the approval of legislation by bill, but is silent regarding the approval of contracts.
We have held that our Legislature has the general power to contract unless there is a constitutional limitation. Advisory Opinion on Constitutionality of 1976 PA 240, 400 Mich 311; 254 NW2d 544 (1977). It is acknowledged by all that our Constitution contains no limits on the Legislature’s power to bind the state to a contract with a tribe; therefore, because nothing prohibits it from doing so, given the Legislature’s residual power, we conclude that the Legislature has the discretion to approve the compacts by resolution.[9]
*329 This understanding of legislative power is well-established. Our Legislature has in the past used the resolution process to ratify amendments of the federal constitution. This Court has declared the resolution process proper in such a circumstance because the Legislature did not engage in a legislative act that enacted a law, but merely expressed its assent to the proposed amendment. Decher v Secretary of State, 209 Mich 565, 571; 177 NW 388 (1920). In the same way, the Legislature here is merely expressing its “assent” to the compacts through HCR 115.
More importantly, because our Legislature had the discretion to approve the compacts by resolution rather than by bill, the courts cannot interfere with that legitimate exercise of legislative discretion. As this Court recognized long ago in Detroit v Wayne Circuit Judge, 79 Mich 384, 387; 44 NW 622 (1890):
It is one of the necessary and fundamental rules of law that the judicial power cannot interfere with the legitimate discretion of any other department of government. So long as they do no illegal act, and are doing business in the range of the powers committed to their exercise, no outside authority can intermeddle with them ....
Therefore, this Court should not interfere with the Legislature’s discretionary decision to approve the compacts by resolution.
IV THE BLANK/CHADHA FACTORS
For the above reasons, we are not persuaded by plaintiffs’ argument that the factors set forth in the lead opinion in Blank v Dep’t of Corrections, 462 Mich 103; 611 NW2d 530 (2000), adopted from Immigration *330 & Naturalization Service v Chadha, 462 US 919; 103 S Ct 2764; 77 L Ed 2d 317 (1983), apply to this case. Blank and Chadha involved the Legislature’s power to alter or amend the statute delegating rule-making authority without doing so by statute. Blank held that once the Legislature grants power to an agency by statutory action, it cannot then diminish or qualify that power except by further statutory action. This “legislative veto” practice at issue in Blank also had a significant state constitutional history. Const 1963, art 4, § 37 allowed temporary legislative vetoes of agency regulations between legislative sessions. In 1984, the people rejected a proposal to amend § 37 and permit the type of permanent legislative veto at issue in Blank. The fact that the legislative veto at issue in Blank was not permitted by the Constitution and had been rejected by the people further illuminates the Blank decision.
No such environment exists here, however, as our Constitution is silent regarding the proper form of legislative approval of tribal-state gaming compacts under IGRA and the people have not expressed a view on this question. Therefore, we do not believe that the Blank/Chada analysis should be applied here.
In response to Justice Markman’s dissent, however, we note that even were the Blank/Chadha analysis to be applied, the factors do not demonstrate that the Legislature’s approval of the compacts was an act of legislation.
A. THE COMPACTS DO NOT ALTER THE LEGAL RIGHTS, DUTIES, AND RELATIONS OF PERSONS OUTSIDE THE LEGISLATIVE BRANCH
To make sense, this factor must apply to persons outside the legislative branch who are subject to the Legislature’s authority. Here, the compacts do not give the state the power to alter the rights, duties, or *331 relations of anyone subject to the Legislature’s authority. Rather, the compacts only set forth the parameters the tribes agree will apply to their operation of gaming facilities. The Legislature has no regulatory duty under the compacts, nor do the compacts confer any “rights” upon the state other than contractual rights. For example, although the state may inspect tribal facilities and records, it has no power to enforce those provisions. Any contractual disputes under the compacts must be submitted to the dispute resolution procedure outlined in the compacts. All duties and restrictions in the compacts fall on the tribes themselves, who are sovereign entities and have consented to the restrictions and additional duties.
B. THE RESOLUTION DID NOT SUPPLANT LEGISLATIVE ACTION
Unlike the actions taken in Blank, HCR 115 did not have the effect of amending or repealing existing legislation when it approved the compacts. As noted above, given the Constitution’s silence regarding the form of approval necessary for tribal-state gaming compacts, the Legislature had the discretion to approve the compacts by resolution. Further, as explained above, the compacts do not impose any affirmative obligations on the state, create rules of conduct for Michigan citizens, or create new state agencies. Such changes would require legislation, but are absent from the compacts. Therefore, legislation is not required and this Court should not interfere with the Legislature’s discretion in approving the compacts by concurrent resolution.
C. THE COMPACTS DO NOT INVOLVE POLICY DETERMINATIONS REQUIRING LEGISLATION
First, it must be remembered that not all policy decisions made by the Legislature are required to be in *332 the form of legislation. See Blank, supra at 170 (Cavanagh, J.). As the United States Supreme Court explained in Yakus v United States, 321 US 414, 424; 64 S Ct 660; 88 L Ed 834 (1944), “[t]he essentials of the legislative function are the determination of legislative policy and its formulation and promulgation as a defined and binding rule of conduct.... ” (Emphasis added.) Here, HCR 115 neither promulgated a legislative policy as a defined and binding rule of conduct nor applied it to the general community. Instead, HCR 115 simply assented to the negotiated contract between two sovereign entities, recognizing that the compacts created no new legal rights or duties for the state or its citizens. Indeed, HCR 115 could never be considered a “promulgation of a legislative policy as a defined and binding rule of conduct” because the Legislature lacks the authority to bind the tribes at all. Without the tribes’ approval, the compacts have no force. Through IGRA, Congress has determined that states may not unilaterally impose their will on the tribes regarding gaming; rather, the states may only negotiate with the tribes through the compacting process.
D. CHADHA’S CONSTITUTIONAL FACTOR IS NOT APPLICABLE GIVEN THE NATURE OF OUR STATE CONSTITUTION
As noted above, our Constitution differs from the federal constitution: the federal constitution grants Congress its power, while our Constitution limits the plenary power of our Legislature. As this Court has recognized:
A different rule of construction applies to the Constitution of the United States than to the Constitution of a state. The federal government is one of delegated powers, and all powers not delegated are reserved to the states or to the people. When the validity of an act of Congress is challenged as unconstitutional, it is necessary to determine *333 whether the power to enact it has been expressly or impliedly delegated to Congress. The legislative power, under the Constitution of a state, is as broad, comprehensive, absolute, and unlimited as that of the Parliament of England, subject only to the Constitution of the United States and the restraints and limitations imposed by the people upon such power by the Constitution of the state itself. [Young v Ann Arbor, 267 Mich 241, 243; 255 NW 579 (1934).]
Thus, the fourth Chadha factor, which was not applied in Blank, is inapplicable here because our Constitution does not grant authority to the Legislature, but instead limits the Legislature’s plenary authority. As explained above, our Constitution’s silence regarding the form of approval needed for tribal-state gaming compacts, therefore, does not lead to the conclusion that the Legislature is prohibited from approving the compacts by resolution; rather, it leads to the conclusion that the form of the approval is within the discretion of the Legislature.
V THE AMENDMENT PROVISION ISSUE SHOULD BE REMANDED
Although we agree with plaintiffs that Governor Granholm’s recent amendments make the amendment provision issue ripe for review, the lower courts have not yet been able to assess this issue since the amendments. It is not proper for us to do so now. Therefore, we remand this issue to the Court of Appeals to consider whether the provision in the compacts purporting to empower the Governor to amend the compacts without legislative approval violates the separation of powers doctrine found in Const 1963, art 3, § 2. The Court of Appeals should remand to the trial court if it determines that further fact-finding is necessary to resolve the issue.
*334 VI. HCR 115 DOES NOT VIOLATE CONST 1963, ART 4, § 29
The “local act” provision of art 4, § 29 of Michigan’s Constitution provides:
The legislature shall pass no local or special act in any case where a general act can be made applicable, and whether a general act can be made applicable shall be a judicial question. No local or special act shall take effect until approved by two-thirds of the members elected to and serving in each house and by a majority of the electors voting thereon in the district affected.
In Hart v Wayne Co, 396 Mich 259; 240 NW2d 697 (1976), this Court considered whether a provision of the municipal courts of record act requiring Wayne County to supplement salaries for recorder’s court judges constituted a “local act” subject to Const 1963, art 4, § 29. We held that the provision did not constitute a “local act” because a recorder’s court performs state functions and the funding of such a court is a state function. Id. at 272. In Attorney General ex rel Eaves v State Bridge Comm, 277 Mich 373; 269 NW 388 (1936), this Court considered whether state legislation authorizing a bridge to Canada located at Port Huron constituted a local act. We held again that it did not, stating: “The bridge in question is international in character and will be used by those from all parts of both nations who desire to enter or leave the United States through Port. Huron.” Id. at 378.
Hart and Eaves, applied to the facts of this case, lead to the same conclusion: tribal-state compacts are not “local acts.” In the absence of express congressional consent, the Legislature has no authority to regulate casino gambling on Indian lands. Like the bridge in Eaves, Indian casinos, located as they are on tribal lands, are “international in character” and are likely to be frequented by Michigan citizens from throughout *335 the state as well as by members of various Indian tribes. Therefore, the approval of state compacts regarding Indian casinos pursuant to IGRA constitutes a unique state function with interests “international in character,” rather than a function of a local unit of government with predominantly local interests. Thus, we hold that the compacts are not “local acts.”
Further, tribal lands subject to compact negotiations are declared as such not by the state or even by the tribes, but by the Department of the Interior. The Department of the Interior has thus far granted to the tribes lands located in the counties specified in the compacts.[10] If, however, the department were to grant to a tribe lands located outside such counties, IGRA would direct the state to negotiate in good faith with the tribe to reach a compact applicable to that land as well. For this additional reason, we are not persuaded that the compacts are “local acts” merely because they reference those specific counties in which the tribes have thus far been granted lands by the department.
Accordingly, we affirm the decision of the Court of Appeals that the compacts do not violate Const 1963, art 4, § 29, albeit for the reasons expressed above.
VII. CONCLUSION
We hold that HCR 115 was a valid method of approving the compacts. The compacts, and hence the Legis *336 lature’s approval of those compacts, do not alter the legal rights or duties of the state or its citizens, nor do they create any state agencies. Therefore, no legislation is required to approve them. Rather, the compacts are simply contracts between two sovereign entities. Without the compacts, the state is prohibited under IGRA from unilaterally regulating tribal gaming in any manner. Further, our Constitution does not limit the Legislature’s discretion regarding the proper approval method for tribal-state gaming compacts. Absent a constitutional limitation, the Legislature has discretion to determine the appropriate method for approving a contract. Moreover, we hold that HCR 115 is not a “local act” and so does not violate Const 1963, art 4, § 29. Finally, because no lower courts have had the opportunity to consider the issue of the amendment provision in the compacts since the issue became ripe for review, we remand that issue to the Court of Appeals for consideration. In all other respects, we affirm the decision of the Court of Appeals.
Taylor and Young, JJ., concurred with Corrigan, C.J.
CAVANAGH, J., concurred only with respect to part IV.
MARKMAN, J., concurred only with respect to part VI.

 In Seminole Tribe of Florida v Florida, 517 US 44; 116 S Ct 1114; 134 L Ed 2d 252 (1996), the United States Supreme Court held that 25 USC *315 2710(d)(7), which permits Indian tribes to sue a state in federal court when that state has refused to negotiate in good faith for a tribal-state compact, was an unconstitutional violation of state sovereign immunity as preserved by the Eleventh Amendment of the United States Constitution.

 These tribes are the Little Traverse Bay Band of Odawa Indians, the Pokagon Band of Potawatomi Indians, the Little River Band of Ottawa Indians, and the Nottawaseppi Huron Potawatomi. The Little Traverse Bay Band and the Little River Band currently operate casinos.

 See § 11 of the compacts.

 Although a bill must be passed by a majority of elected and serving members of the Legislature, a resolution may be passed by a majority vote of those legislators present at the time, provided a quorum is present. The House of Representatives approved the compacts by a resolution vote of 48 to 47, and the Senate followed suit by a resolution vote of 21 to 17.

 The Sault Ste. Marie Tribe of Lake Superior sued in federal court to enjoin the operation of the new casinos, but the United States Court of Appeals for the Sixth Circuit dismissed this suit on standing grounds. Sault Ste Marie Tribe v United States, 288 F3d 910 (CA 6, 2002). Two state legislators also challenged the approval of the Secretary of Interior of Michigan’s 1998 compacts, but that suit was also dismissed on standing grounds by the United States Court of Appeals for the Sixth Circuit. Baird v Norton, 266 F3d 408 (CA 6, 2001).

 Igra even prohibits the state from frustrating the tribe’s desire to enter into class III gaming by refusing to negotiate. In the event that a state will not negotiate or an agreement cannot he reached, although under Seminole Tribe the state may not be sued, it appears that the tribe may approach the Secretary of the Interior, who can approve a compact under 25 USC 2710(d)(8).

 The court did not specify what form that legislative approval would have to take.

 See also Thompson v Auditor General, 261 Mich 624, 642; 247 NW 360 (1933), in which the Court stated:
The power of the legislature of this State is as omnipotent as that of the parliament of England, save only as restrained by the Constitution of the United States and the Constitution of this State. ... 1 Cooley, Constitutional Limitations (8th Ed.), p. 354.

 In fact, action by concurrent resolution is common when the Constitution is silent regarding the appropriate procedure. Various constitutional provisions require legislative action but fail to specify its form: Const 1963, art 4, § 53 (appointment of auditor general), Const 1963, art 11, § 5 (approval of certain civil service pay increases), Const 1963, art 4, § 17 (establishing special legislative committees), and Const 1963, art 10, *329 § 5 (designation of land as part of state land reserve). In such situations, the Legislature has historically acted by concurrent resolution.

 The mere fact that Indian land is located in a specific county does not give that county jurisdiction over that land, just as Michigan does not have absolute jurisdiction over all tribal lands located within its borders. As already noted, absent express congressional consent, neither the state nor a local unit of government may regulate tribal affairs. Thus, the compacts are not “local acts” because the tribal lands that they regulate are not subject to local jurisdiction as contemplated by Const 1963, art 4, § 29.