VILLAGE OF HOLLY v HOLLY TOWNSHIP

Docket No. 254379. Submitted June 15, 2005, at Detroit. Decided July 26, 2005, at 9:00 a.m. Leave to appeal sought.

The village of Holly and the Village of Holly Downtown Development Authority brought an action in the Oakland Circuit Court against Holly Township and the Holly Township Treasurer, seeking declaratory and equitable relief concerning a resolution the township adopted to exempt certain taxes from capture by the downtown development authority. The court, Gene Schnelz, J., concluded that, while the resolution had not been adopted within sixty days after the public hearing on amending the boundaries of the downtown development authority, it was adopted within sixty days after the public hearing on a tax increment financing plan for the expanded downtown development authority, and was thus timely under MCL 125.1653(3). The plaintiffs appealed.

The Court of Appeals *held*:

MCL 125.1653(3) permits the governing body of a taxing jurisdiction, such as the township, to adopt a resolution to exempt its taxes from capture by a downtown development authority (DDA). The statute requires that the taxing jurisdiction adopt the resolution within sixty days after "a public hearing held after February 15, 1994." The statute is not ambiguous because it does not irreconcilably conflict with other provisions and is not equally susceptible to more than one meaning. Read as a whole, the most reasonable interpretation of the interlocking provisions within MCL 125.1653 is that the Legislature intended the phrase "a public hearing held after February 15, 1994," to mean only a public hearing specified in that section to create a DDA or to amend the boundaries of an existing DDA. The resolution in this case was not adopted within sixty days after such a hearing.

Reversed and remanded for further proceedings.

TAXATION — DOWNTOWN DEVELOPMENT AUTHORITIES — MUNICIPAL CORPORATIONS — EXEMPTION OF TAXES FROM CAPTURE.

The provision of the downtown development authority act that allows a taxing jurisdiction affected by a proposed new or expanded downtown development authority to exempt its taxes from

capture by the authority requires the taxing jurisdiction to adopt an exemption resolution within sixty days after a public hearing held to create a downtown development authority or to modify the boundaries of an existing authority (MCL 125.1653[3]).

*Simen, Figura & Parker, P.L.C.* (by *Richard J. Figura* and *Kari E. Burba*), for the plaintiffs.

*Adkison, Need & Allen, PLLC* (by *Gregory K. Need*), for the defendants.

Amici Curiae:

*Tomkiw Dalton, PLC* (by *Daniel P. Dalton*), for the Michigan Downtown and Finance Authority.

*Miller, Canfield, Paddock and Stone, P.L.C.* (by *Patrick F. McGow* and *Ruth H. Swartout*), for the Michigan Municipal League.

Before: SAWYER, P.J., and MARKEY and MURRAY, JJ.

MARKEY, J. In this case of first impression, we must decide whether Holly Township timely adopted a resolution to exempt its taxes from capture by the Village of Holly Downtown Development Authority. MCL 125.1653(3) provides, in pertinent part: "Not more than 60 days after a public hearing held after February 15, 1994, the governing body of a taxing jurisdiction levying ad valorem property taxes that would otherwise be subject to capture may exempt its taxes from capture by adopting a resolution to that effect and filing a copy with the clerk of the municipality proposing to create the authority." The issue on appeal is whether, despite the use of the indefinite article "a" preceding "public hearing," the Legislature intended to refer only to those public hearings necessary to create a downtown development authority or to amend the boundaries of an

existing authority. By reading subsection 3 in context, we conclude that the Legislature intended to refer only to public hearings specified in MCL 125.1653. Accordingly, we reverse the trial court's judgment to the contrary.

### STATEMENT OF FACTS

In 1975, the Legislature adopted the downtown development authority act (the "Act"), MCL 125.1651 *et seq*. 1975 PA 197. As stated in its title, the Act was intended to allow the creation of downtown development authorities to, among other things, "correct and prevent deterioration in business districts; to encourage historic preservation; . . . to authorize the creation and implementation of development plans in the districts; [and] to promote the economic growth of the districts . . . ." Further, the Legislature stated that the Act was intended to "provide a means for local units of government to eliminate property value deterioration and to promote economic growth in the communities served by those local units of government." MCL 125.1651a(h). The Act provides for the funding of downtown development authorities (DDAs) by "capturing" increases in taxes on property within the boundaries of the DDA levied by other governmental bodies. In theory, the "captured" increased taxes result from the increase of property values over an initial assessed valuation attributed to economic development the DDA activities stimulate. Thus, "tax increment financing is a government financing program that contributes to economic growth and development by dedicating a portion of the increase in the tax base resulting from economic growth and development to facilities, structures, or improvements within a development area thereby facilitating economic growth and development." MCL 125.1651a(d).

The Act requires two types of public hearings. Section 3, MCL 125.1653, requires a public hearing before a municipality (a city, village, or township) creates a DDA with specified boundaries or amends an existing DDA's district boundaries. Section 18, MCL 125.1668, requires a public hearing before the governing body that created the DDA adopts an ordinance approving the DDA's development plan or tax increment financing (TIF) plan.

The village of Holly formed its DDA in 1984. In 1993, the Legislature amended the Act to add a procedure for taxing jurisdictions affected by a proposed new or expanded DDA to "opt out" and thereby prevent the DDA from capturing revenue that would otherwise go to the taxing jurisdiction. As amended by 1993 PA 323,[1] § 3 of the Act provides:

> (1) When the governing body of a municipality determines that it is necessary for the best interests of the public to halt property value deterioration and increase property tax valuation where possible in its business district, to eliminate the causes of that deterioration, and to promote economic growth, the governing body may, by resolution, declare its intention to create and provide for the operation of an authority.

> (2) In the resolution of intent, the governing body shall set a date for the holding of a public hearing on the adoption of a proposed ordinance creating the authority and designating the boundaries of the downtown district. Notice of the public hearing shall be published twice in a newspaper of general circulation in the municipality, not less than 20 *or* more than 40 days before the date of the hearing. *Not less than 20 days before the hearing, the governing body proposing to create the authority* shall also *mail notice of the hearing* to the property taxpayers of

[1] Section 3 of the Act was further amended by 2004 PA 521 and 2005 PA 13, which amendments do not affect the analysis of the issue presented in this case.

record in the proposed district *and for a public hearing to be held after February 15, 1994 to the governing body of each taxing jurisdiction levying taxes that would be subject to capture if the authority is established and a tax increment financing plan is approved.* Failure *of a property taxpayer* to receive the notice shall not invalidate these proceedings. Notice of the hearing shall be posted in at least 20 conspicuous and public places in the proposed downtown district not less than 20 days before the hearing. The notice shall state the date, time, and place of the hearing, and shall describe the boundaries of the proposed downtown district. A citizen, taxpayer, or property owner of the municipality *or an official from a taxing jurisdiction with millage that would be subject to capture* has the right to be heard in regard to the establishment of the authority and the boundaries of the proposed downtown district. The governing body of the municipality shall not incorporate land into the downtown district not included in the description contained in *the* notice of public hearing, but it may eliminate described lands from the downtown district in the final determination of the boundaries.

(3) *Not more than 60 days after a public hearing held after February 15, 1994, the governing body of a taxing jurisdiction levying ad valorem property taxes that would otherwise be subject to capture may exempt its taxes from capture by adopting a resolution to that effect and filing a copy with the clerk of the municipality proposing to create the authority. The resolution takes effect when filed with that clerk and remains effective until a copy of a resolution rescinding that resolution is filed with that clerk.*

*(4) Not less than 60 days* after the public hearing, if the governing body of the municipality intends to proceed with the establishment of the authority, it shall adopt, by majority vote of its members, an ordinance establishing the authority and designating the boundaries of the downtown district within which the authority shall exercise its powers. The adoption of the ordinance is subject to any applicable statutory or charter provisions in respect to the approval or disapproval by the chief executive or other officer of the municipality and the adoption of an ordinance

over his veto. This ordinance shall be filed with the secretary of state promptly after its adoption and shall be published at least once in a newspaper of general circulation in the municipality.

*(5)* The governing body of the municipality may alter or amend the boundaries of the downtown district to include or exclude lands from the downtown district *pursuant to* the same requirements for adopting the ordinance creating the authority. [MCL 125.1653, as amended by 1993 PA 323; text added or altered by that public act shown in italics.]

1993 PA 323 did not affect § 18 of the Act, which requires a public hearing before a municipality adopts an ordinance approving a DDA development plan or TIF plan. As originally enacted and at all times pertinent to this case, § 18 provides:

(1) The governing body, before adoption of an ordinance approving a development plan or tax increment financing plan, shall hold a public hearing on the development plan. Notice of the time and place of the hearing shall be given by publication twice in a newspaper of general circulation designated by the municipality, the first of which shall be not less than 20 days before the date set for the hearing. Notice of the hearing shall be posted in at least 20 conspicuous and public places in the downtown district not less than 20 days before the hearing. Notice shall also be mailed to all property taxpayers of record in the downtown district not less than 20 days before the hearing.

(2) Notice of the time and place of hearing on a development plan shall contain: a description of the proposed development area in relation to highways, streets, streams, or otherwise; a statement that maps, plats, and a description of the development plan, including the method of relocating families and individuals who may be displaced from the area, are available for public inspection at a place designated in the notice, and that all aspects of the development plan will be open for discussion at the public hearing; and other information that the governing body deems appropriate. At the time set for hearing, the govern-

ing body shall provide an opportunity for interested persons to be heard and shall receive and consider communications in writing with reference thereto. The hearing shall provide the fullest opportunity for expression of opinion, for argument on the merits, and for introduction of documentary evidence pertinent to the development plan. The governing body shall make and preserve a record of the public hearing, including all data presented thereat. [MCL 125.1668.][2]

The parties agree on the pertinent facts leading up to this appeal. This dispute arose after the village passed a resolution giving notice of its intent to expand the boundaries of its DDA and noticed a public hearing for July 11, 2000. Although the DDA of the village of Holly had existed for a decade before the right of taxing jurisdictions to exempt their taxes from capture was created, subsection 5 of § 3 requires that DDA boundary expansions be approved through the same notice and public hearings process as for a new DDA. MCL 125.1653(5). Therefore, the village's proposed DDA boundary expansion had to be considered at a public hearing. MCL 125.1653(2).

Following the July 11, 2000, public hearing, however, the village took no action on the original proposal and instead decided to consider different boundaries for an expanded DDA district. A second public hearing was held on October 24, 2000, to consider a new proposed ordinance to expand the boundaries of the DDA district. Holly Township was one of the affected taxing jurisdic-

---

[2] 2005 PA 13 added the following language at the end of subsection 1 of § 18: "Beginning June 1, 2005, the notice of hearing within the time frame described in this subsection shall be mailed by certified mail to the governing body of each taxing jurisdiction levying taxes that would be subject to capture if the development plan or the tax increment financing plan is approved or amended." 2005 PA 13 also made other minor changes to § 18. These amendments do not affect our analysis.

tions[3] that were given notice of the second public hearing as required by the Act. The parties agree that no taxing jurisdiction within the proposed expanded DDA boundaries adopted a resolution exempting its taxes from capture during the sixty days following the October 24, 2000, public hearing. On January 9, 2001, more than sixty days after the October 24, 2000, public hearing, the village adopted an ordinance to expand the boundaries of the DDA district. The village filed the ordinance with the Secretary of State and published it as required by law. See MCL 125.1653(4).

The village then gave the notices required under the Act for an April 24, 2001, public hearing on a proposed development plan, MCL 125.1667, and a TIF plan, MCL 125.1664, for the expanded DDA. The public hearing on the proposed plans occurred as scheduled, and the village thereafter adopted an ordinance approving them. Because of a problem with the original notice for the April 24, 2001, public hearing, the village again noticed and held a new public hearing on July 10, 2001. The village again enacted its ordinance approving the DDA's development and TIF plans on August 14, 2001. See MCL 125.1668.

Meanwhile, on May 15, 2001, the township adopted it own resolution entitled "Resolution to Exempt Taxes from Capture." The village received the township's resolution on May 17, 2001. Thereafter, the township treasurer refused to account for or transfer taxes that the expanded DDA would otherwise have captured.

Unable to persuade the township that its exemption resolution was ineffective, plaintiffs, the village and its

---

[3] The other taxing jurisdictions affected by the proposed DDA boundary expansion include Oakland County, Oakland Community College, the Oakland Intermediate School District, the Holly Area Schools, and the village of Holly.

DDA, sought declaratory and equitable relief against the township and its treasurer. Plaintiffs asked the court to declare that (1) the township's exemption resolution was invalid because it was not adopted within sixty days following the public hearing regarding expanding the boundaries of the DDA, (2) the DDA was entitled to the TIF revenue specified in the plan, (3) plaintiffs were entitled to an accounting, and (4) plaintiffs were entitled to the capture revenue and interest from the time the TIF plan was approved.

The trial court decided the case on cross-motions for summary disposition, the parties' stipulation of facts and exhibits, and briefs. In its opinion, the trial court began with the premise that the Act requires two public hearings: the first to create a DDA or alter its boundaries and the second to adopt a TIF plan.[4] The trial court noted that the parties agreed that the township's exemption resolution was adopted within sixty days of the second public hearing (on the TIF), but not within sixty days of the first public hearing (on the DDA's boundaries). The court ruled that the township's exemption resolution was timely, reasoning "that absent a specific determination by [the] [L]egislature requiring exemption to be after the first hearing required, that the only fair interpretation is that the exemption may be done after any required public hearing, incident to the Act." As self-described dicta, the court also reasoned that until a "final determination" was made, a taxing jurisdiction would not have a "full and clear understanding of the effect of the action taken," and that "the Legislature did not intend for a hasty decision . . . , but

---

[4] We note that a TIF plan "may be modified if the modification is approved by the governing body upon notice and after public hearings and agreements as are required for approval of the original plan." MCL 125.1664(5).

provide[d] for an opportunity [to opt out] once it was clear all issues had been determined by the enacted body."

The village and its DDA appeal by right. Amici curiae, the Michigan Downtown and Finance Association and the Michigan Municipal League, have also filed briefs.

STANDARD OF REVIEW

The application of a statute is a question of law this Court reviews de novo. *Eggleston v Bio-Medical Applications of Detroit, Inc,* 468 Mich 29, 32; 658 NW2d 139 (2003). "If the language of a statute is clear, no further analysis is necessary or allowed." *Id.* This tenet is based on the principles that when interpreting statutes, the judiciary's primary goal is to give effect to the intent of the Legislature. The primary source of discovering legislative intent is the language of the statute itself. *Nastal v Henderson & Assoc Investigations, Inc,* 471 Mich 712, 720; 691 NW2d 1 (2005). "The Legislature is presumed to have intended the meaning it has plainly expressed, and if the expressed language is clear, judicial construction is not permitted and the statute must be enforced as written." *Robertson v DaimlerChrysler Corp,* 465 Mich 732, 748; 641 NW2d 567 (2002). When reading a statute, we must ascribe to every word or phrase its plain and ordinary meaning unless otherwise defined in the statute, and "it is important to ensure that words in a statute not be ignored, treated as surplusage, or rendered nugatory." *Id.*

Furthermore, we must not read a word or phrase of a statute in isolation. Each word or phrase and its placement must be read in context of the whole act. *Shinholster v Annapolis Hosp,* 471 Mich 540, 549; 685 NW2d 275 (2004). "Contextual understanding of statutes is

generally grounded in the doctrine of *noscitur a sociis*: '[i]t is known from its associates,' see Black's Law Dictionary (6th ed), p 1060. This doctrine stands for the principle that a word or phrase is given meaning by its context or setting." *Tyler v Livonia Pub Schools*, 459 Mich 382, 390-391; 590 NW2d 560 (1999). Thus, this Court must consider "both the plain meaning of the critical word or phrase as well as 'its placement and purpose in the statutory scheme.' " *Sun Valley Foods Co v Ward*, 460 Mich 230, 237; 596 NW2d 119 (1999), quoting *Bailey v United States*, 516 US 137, 145; 116 S Ct 501; 133 L Ed 2d 472 (1995).

## ANALYSIS

We first summarize the salient parts of the excellent briefs of the parties and amici curiae.

Plaintiffs argue that MCL 125.1653(3) is ambiguous because it is susceptible to two or more constructions. But the Legislature intended that a taxing jurisdiction's ability to exempt its taxes from capture is limited to the sixty-day period following a § 3 hearing because there is no similar opt-out provision in § 18 for a TIF plan hearing. Plaintiffs also argue that the sixty-day period of subsection 3 dovetails with the sixty-day waiting period of subsection 4 before a municipality may create an authority or amend the boundaries of an existing DDA. Plaintiffs further note that in the critical sentence of subsection 3, the phrase "the clerk of the municipality proposing to create the authority" pertains to the future, i.e., to a DDA not yet created. This indicates the Legislature's intent to limit the opt-out ability of a taxing jurisdiction to only § 3 hearings necessary to create a DDA or amend its boundaries. Plaintiffs further argue that their construction of the statute is supported by the Act's legislative history and

the position of the State Tax Commission in a document it published entitled "Frequently Asked Questions About Tax Increment Financing." In addition, plaintiffs contend that defendants' interpretation of subsection 3 would frustrate the Act's purposes.

Defendants argue that subsection 3 is clear and unambiguous; therefore, it must be enforced as written. According to defendants, the Legislature could have specifically limited the ability of a taxing jurisdiction to exempt its taxes from capture to sixty days following a § 3 public hearing, but instead used the indefinite article "a" to modify "public hearing." This wording unambiguously includes either a § 3 hearing or a § 18 hearing. Defendants further assert that their interpretation of subsection 3 is consistent with the definition of the word "a" to mean "any." See, e.g., *Hagerman v Gencorp Automotive*, 457 Mich 720, 728-729; 579 NW2d 347 (1998), quoting Black's Law Dictionary (5th ed) in comparing the definitions of "a" and "the":

> "The word 'a' has varying meanings and uses. 'A' means 'one' or 'any,' but less emphatically than either. . . .
>
> ". . . The most unlettered persons understand that 'a' is indefinite, but 'the' refers to a certain object."

Defendants also argue that their interpretation of subsection 3 is consistent with good public policy because it permits taxing jurisdictions the opportunity to study details of proposed TIF and development plans before deciding whether to exempt their taxes from capture.

Amicus curiae, the Michigan Downtown and Finance Authority (MDFA), argues that reading the Act as a whole, and keeping in mind the separate purposes of a § 3 hearing and a § 18 hearing, the reference in subsection 3 to "a public hearing" is clear and unambiguous: It limits the ability of taxing jurisdictions to exempt

2005]     VILLAGE OF HOLLY v HOLLY TWP     473

taxes from capture to the sixty-day window following a § 3 public hearing conducted either to create a new DDA or to amend the boundaries of an existing DDA. The MDFA also argues that allowing taxing jurisdictions to opt out after a DDA has been created would hamper the DDA's ability to adopt or amend development or TIF plans, thus denying such authorities a stable revenue stream.

Amicus curiae, the Michigan Municipal League (MML), agrees with the MDFA that the plain language of subsection 3 limits the opt-out provision to a § 3 hearing conducted to either create a new DDA or amend the boundaries of an existing DDA.

The MML argues in the alternative that if subsection 3 is ambiguous, the Legislature's intent to limit the opt-out window to sixty days following a public hearing to create a new DDA or a public hearing to amend a DDA's boundaries is manifested by contemporaneous amendments to similar statutes. Specifically, the MML notes that at the same time that the opt-out provision was added to the Act, an identical provision was added to the Local Development Financing Act (LDFA), MCL 125.2151 *et seq.*, but not to the Tax Increment Finance Authority Act (TIFA), MCL 125.1801 *et seq.*[5] Although new development plans and TIF plans could be created

---

[5] With respect to the LDFA, MCL 125.2154(3), as amended by 1993 PA 333, provides in pertinent part:

Not more than 60 days after a public hearing held after February 15, 1994, the governing body of a taxing jurisdiction with millage that would otherwise be subject to capture may exempt its taxes from capture by adopting a resolution to that effect and filing a copy with the clerk of the municipality proposing to create the authority.

The bills that produced 1993 PA 323 and 1993 PA 333 were among numerous bills that required the enactment of all the specified bills for

within existing TIF authority boundaries, new TIF authorities could not be created or expanded after 1986, and, therefore, it was unnecessary to provide taxing jurisdictions with an opt-out provision. So, the MML argues, the Legislature's failure to add opt-out language to the TIFA shows that it only intended that process to apply when an authority was being formed or boundaries amended.

We agree with defendants and the amici curiae that MCL 125.1653(3) is not ambiguous. Although reasonable minds may differ on the interpretation of subsection 3, that is not the test to determine whether a statutory ambiguity justifies judicial construction. *Fluor Enterprises, Inc v Dep't of Treasury*, 265 Mich App 711, 720; 697 NW2d 539 (2005), citing *Lansing Mayor v Pub Service Comm*, 470 Mich 154, 165-166; 680 NW2d 840 (2004). "Rather, a provision of the law is ambiguous only if it 'irreconcilably conflict[s]' with another provision, . . . or when it is *equally* susceptible to more than a single meaning." *Id.* at 166, citing *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 467; 663 NW2d 447 (2003). We conclude that no conflict exists between subsection 3 and any other statutory provision and that, when read in context, subsection 3 is not equally susceptible to more than a single meaning. Consequently, subsection 3 is unambiguous, precluding judicial construction other than on the basis of the text of the statute. *Shinholster, supra* at 549. We hold that the interpretation of MCL 125.1653(3) advanced by plaintiffs and the amici curiae best states the Legisla-

---

any to become law, including those bills that became Public Acts 312 through 314, 322, 323, 325 through 334, 336, 338, and 340 of 1993.

With respect to the TIFA, MCL 125.1829(1) provides: "Beginning January 1, 1987, a new authority or authority district shall not be created and the boundaries of an authority district shall not be expanded to include additional land."

ture's intent. See *Lansing Mayor, supra* at 164 (the judiciary must "read the actual language of the law and determine its best interpretation"), and *Houghton Lake Area Tourism & Convention Bureau v Wood*, 255 Mich App 127, 135; 662 NW2d 758 (2003) ("This Court must determine the reasonable construction that best effects the Legislature's intent."). Our conclusion is based on the text of the statute, not policy reasons. We reject all policy-based arguments regarding subsection 3 because our " 'judicial role precludes imposing different policy choices than those selected by the Legislature . . . .' " *Robertson, supra* at 752, quoting *People v Sobczak-Obetts*, 463 Mich 687, 694; 625 NW2d 764 (2001).

Read as a whole, § 3 of the Act establishes the procedure for creating a DDA or amending the boundaries of an existing DDA. MCL 125.1653(1) and (5). Subsections 2, 3, and 4 of § 3 all dovetail harmoniously and indicate that "a public hearing held after February 15, 1994," in subsection 3 must refer to the public hearing necessary for purposes of subsection 1 or 5. Subsection 2 requires notice "to the governing body of each taxing jurisdiction levying taxes that would be subject to capture if the authority is established and a tax increment financing plan is approved". of "a public hearing to be held after February 15, 1994 . . . ." Subsection 3 provides an opt-out opportunity within sixty days of a public hearing described in the same manner as in subsection 2: "a public hearing held after February 15, 1994 . . . ." Further, the sixty-day opt-out window of subsection 3 exactly corresponds to the sixty-day waiting period of subsection 4 before a municipality may adopt an ordinance creating a DDA or amending an existing DDA's boundaries as permitted by subsection 5. We therefore conclude that the most reasonable interpretation of these interlocking provisions is that "a public hearing to be held after February 15, 1994," in

subsection 2 and "a public hearing held after February 15, 1994," in subsection 3, both refer to the same public hearing, one held to create a DDA or modify the boundaries of a DDA. Indeed, subsections 2, 3, and 4 provide the logical time sequence of establishing a DDA or modifying an authority's boundaries: (1) notice to taxpayers and taxing jurisdictions of a public hearing, (2) a public hearing, (3) a sixty-day period during which taxing jurisdictions may opt out and during which the governing body desiring to create or amend a DDA may not act, and (4) adoption of an ordinance creating a DDA or amending its boundaries.

This reading of the statute is confirmed by the Legislature's use of language with a future sense in the critical sentence conveying the right upon taxing jurisdictions to "exempt its taxes from capture by adopting a resolution to that effect and filing a copy with the clerk of the municipality proposing to create the authority." MCL 125.1653(3). This language clearly limits "a public hearing held after February 15, 1994," in subsection 3 to a hearing to create a new DDA or to amend the boundaries of an existing DDA pursuant to subsection 5. In other words, a DDA is no longer "proposed" once its founding municipality completes the actions required to form the authority, i.e., adoption of the "ordinance *establishing the authority* and designating the boundaries of the downtown district . . . ." MCL 125.1653(4) (emphasis added). Defendants' interpretation fails because a § 18 public hearing on a proposed development plan or TIF plan can only be held when a DDA already exists. MCL 125.1668. Indeed, a DDA must exist to propose a TIF or development plan. MCL 125.1664(1) and 125.1667(1).

Moreover, 1993 PA 323, which added subsection 3 of § 3, did not amend § 18 of the Act. In contrast to MCL

125.1653(2), which requires that notice be given "to the governing body of each taxing jurisdiction levying taxes that would be subject to capture if the authority is established and a tax increment financing plan is approved," the Legislature did not require that notice be given to taxing jurisdictions of a § 18 public hearing. MCL 125.1668.[6] Instead, before a public hearing on a proposed TIF or development plan, the governing body must afford taxing jurisdictions within the DDA district the opportunity to meet to be fully informed "of the fiscal and economic implications of the proposed development area." MCL 125.1664(4). "The [DDA] *may* enter into agreements with the taxing jurisdictions and the governing body of the municipality in which the development area is located to share a portion of the captured assessed value of the district." *Id.* (emphasis added). This plain and unambiguous language makes permissive revenue-sharing agreements between an existing DDA and a taxing jurisdiction that has not timely exempted its taxes at the boundaries-creation stage during the sixty-day window afforded under subsection 3 of § 3 of the Act. See *Phinney v Perlmutter,* 222 Mich App 513, 561; 564 NW2d 532 (1997) ("The term 'may' in a statute ordinarily designates a permissive provision.").

Our reading of the statute is further supported by the fact that the Legislature included a requirement that

---

[6] 2005 PA 13 amended § 18 to require taxing jurisdictions be notified of TIF or development plan public hearings as of June 1, 2005. See n 2 of this opinion. But the 2005 amendment cannot affect what the Legislature's intent was in 1993 when it added subsection 3 of § 3 of the Act. Although the Legislature has now required that taxing jurisdictions receive notice of TIF or development public hearings, mandatory opportunities for informational meetings with governing bodies and permissive revenue-sharing agreements with DDAs remain unchanged. MCL 125.1664(4).

notice be provided to taxing jurisdictions and a sixty-day window to opt out in § 3 of the Act, but omitted such provisions from § 18 of the Act. We must assume that the omission from § 18 was intentional. *Houghton Lake, supra* at 135. "The omission of a provision in one part of a statute, which is included elsewhere in the statute, should be construed as intentional." *Cherry Growers, Inc v Agricultural Marketing & Bargaining Bd*, 240 Mich App 153, 170; 610 NW2d 613 (2000). We cannot, under the guise of interpretation, give an option to taxing jurisdictions at the TIF or development plan stage that the Legislature has not provided for in the Act because courts should not include provisions in a statute that the Legislature has not included. *Polkton Charter Twp v Pellegrom*, 265 Mich App 88, 103; 693 NW2d 170 (2005), citing *In re Wayne Co Prosecutor*, 232 Mich App 482, 486; 591 NW2d 359 (1998).

The Legislature's use of the indefinite article "a" preceding "public hearing held after February 15, 1994," in subsection 3 of § 3 is defendants' sole text-based argument in support of their position. Read literally and in isolation, "a public hearing held after February 15, 1994," would include any public hearing after February 15, 1994, whether or not related to a DDA or the capture of taxes. But words in a statute should not be assigned their literal meanings where the context of their surroundings and the statute read as a whole indicate otherwise. *Tyler, supra* at 390-391; *Root v Ins Co of North America*, 214 Mich App 106, 109; 542 NW2d 318 (1995). Here, defendants concede that the phrase "a public hearing held after February 15, 1994," is limited by its placement in the Act to a subset of public hearings related to the Act, i.e., public hearings after February 15, 1994, either pursuant to § 3 or pursuant to § 18. Defendants' argument fails because it offers no textual basis for including § 18 public hearings

in the phrase "a public hearing held after February 15, 1994," that counters the text-based reasons for limiting that phrase to § 3 public hearings.

In summary, we hold that the Legislature intended "a public hearing held after February 15, 1994," in subsection 3 of § 3, MCL 125.1653(3), to mean only a public hearing specified in § 3 of the Act, i.e., either a public hearing to create a DDA or a public hearing to amend the boundaries of an existing DDA. Accordingly, we reverse the judgment in favor of defendants and remand this case to the trial court for further proceedings consistent with this opinion. We do not retain jurisdiction.