HOOVER v MICHIGAN MUTUAL INSURANCE COMPANY

Docket No. 278237. Submitted October 7, 2008, at Detroit. Decided
    December 11, 2008, at 9:05 a.m. Leave to appeal sought.

Michael Hoover was injured by a drunk driver, rendering him
    developmentally disabled and quadriplegic. His parents, Rodney
    and Maxine Hoover, as conservators of his estate, brought an
    action in the Genesee Circuit Court in 1986 against Michigan
    Mutual Insurance Company, now known as Amerisure Mutual
    Insurance Company, to recover personal protection insurance
    benefits. The parties litigated the amount of benefits over the
    years and settled the amounts payable for many items necessary
    for Michael's care. The plaintiffs subsequently moved for an
    increase in benefits to cover home-care and living expenses, while
    the defendant moved for a reduction. The court, Robert M.
    Ransom, J., attributed 28 percent of the plaintiffs' home to
    Michael's needs and ordered the defendant to pay benefits cover-
    ing that percentage of various expenses, such as property taxes
    and utility bills. The court ordered the defendant to pay benefits
    for 100 percent of other expenses, such as a backup generator and
    a dumpster. The court also ordered the defendant to pay the
    plaintiffs $15 an hour for the time spent cleaning Michael's
    portion of the house and some of the time spent removing snow
    from the driveway. Finally, the court ruled that the plaintiffs were
    entitled to penalty interest under MCL 500.3142 and reasonable
    attorney fees under MCL 500.3148. The defendant sought delayed
    leave to appeal. The Court of Appeals denied the application, but
    the Supreme Court remanded the case to the Court of Appeals for
    consideration as on leave granted. 478 Mich 865 (2007).

        The Court of Appeals *held*:

        The trial court did not properly apply *Griffith v State Farm Mut
    Automobile Ins Co*, 472 Mich 521 (2005), resulting in erroneous
    conclusions on several, but not all, of the expenses and services at
    issue.

        1. *Griffith* held that a no-fault insurer must pay benefits only
    to the extent that the benefits claimed are causally connected to
    the accidental bodily injury arising out of the automobile accident.
    *Griffith* requires a court to determine whether the expenses would

not have been incurred but for the accident and the resulting injury, that is, whether the expenses would have been incurred in the course of an ordinary life unmarred by an accident. If they would have been incurred anyway, a causal connection between the expenses and the accidental bodily injury would be lacking, and it could not be said that the accidental bodily injury necessitated the provision of products, services, and accommodations.

2. Under *Griffith*, parents providing accommodations and services for an injured adult child are not afforded no-fault benefits to the full extent of the accommodations and services provided. For example, had Michael not been injured, his activities would still have generated expenses for utility usage. Given the *Griffith* requirement of a causal connection, a court must allocate not the portion of a utility bill attributable to the injured person's usage, but that portion attributable to the injured person's usage that is occurring only because of the injuries, such as the power to operate Michael's ventilator. *Griffith* requires this even though the calculations and the proper allocation might prove difficult.

3. The trial court did not err by awarding benefits covering 100 percent of the costs of the backup generator, television monitoring system, medical alert pendant, elevator inspections, and dumpster. Those expenses are causally connected to, and necessitated by, Michael's injuries. Michael's injuries require use of an elevator, and inspecting it is a normal safety precaution. Even though the plaintiffs also use the dumpster for their garbage and Michael would generate some waste even if injury-free, Michael generates most of the garbage that goes into it, and a dumpster would not be necessary absent Michael's injuries. Like the special diet food discussed in *Griffith*, the dumpster is fully covered as a no-fault benefit.

4. The size of the house, its design, and various amenities in it are causally connected to, and necessitated by, Michael's injuries. These, in turn, have increased the amounts the plaintiffs pay for property taxes, homeowner's insurance, maintenance, and utilities. Some of the costs associated with the security system are also causally connected to, and necessitated by, Michael's injuries.

5. Maxine Hoover is entitled to be compensated for any time spent cleaning areas that Michael and his caregivers use that goes beyond the time for cleaning one would ordinarily expect to perform. Costs for snow removal greater than those that would regularly be spent—to provide round-the-clock access for shift nurses, for example—are attributable to Michael's needs.

6. Further development of the record under the *Griffith* framework is appropriate. A remand is proper for the parties to submit

additional evidence on each of the expenses remaining at issue. The 28 percent allocation ordered by the trial court was not legally sound and is inconsistent with the analysis under *Griffith*.

7. The defendant unreasonably refused to pay or delayed paying benefits for expenses associated with the backup generator, television monitoring system, medical alert pendant, elevator inspections, and dumpster. Attorney fees are recoverable to the extent that they relate to benefits for those expenses, and penalty interest is appropriate with respect to those items. Further review is necessary before the trial court can determine the appropriateness of additional attorney fees and penalty interest for the other items of expense. No basis currently exists for awarding the defendant attorney fees under MCL 500.3148(2) for an excessive or fraudulent claim without foundation brought by the plaintiffs.

Affirmed in part, reversed in part, and remanded for further proceedings.

SCHUETTE, P.J., concurring in part and dissenting in part, agreed that the 28 percent allocation was not legally sound and was arbitrary and that there is no basis for awarding the defendant attorney fees because the plaintiffs' claims were not fraudulent. He dissented, however, from awarding the plaintiffs benefit payments for any costs other than those for the backup generator, television monitoring system, and medical alert pendant and from the determination that the defendant unreasonably refused to pay or delayed payment of benefits for any costs other than the costs for those items. The trial court should recalculate attorney fees with respect to the items that the defendant conceded were appropriate, and interest under MCL 500.3142(2) is appropriate only for late payment regarding those items.

INSURANCE — NO-FAULT — PERSONAL PROTECTION INSURANCE BENEFITS — FAMILY MEMBERS.

A no-fault insurer is liable to pay personal protection insurance benefits only to the extent that the benefits claimed are causally connected to the accidental bodily injury arising out of the automobile accident; in the case of items for which expenses would have been incurred even in the absence of the accident and resulting injury, a court must determine what portion is causally connected to the injury and allocate not the portion of the expenses attributable to the injured person's usage, but the portion attributable to the injured person's usage that is occurring only because of the injury (MCL 500.3105[1], 500.3107[1][a]).

*C. Robert Beltz* for the plaintiffs.

*Garan Lucow Miller, P.C.* (by *Daniel S. Saylor* and *William J. Brickley*), for the defendant.

Before: SCHUETTE, P.J., and MURPHY and FITZGERALD, JJ.

MURPHY, J. Defendant appeals the trial court's order awarding plaintiffs personal protection insurance (PIP) benefits under the no-fault act, MCL 500.3101 *et seq.*, for various housing and living expenses, as well as services, associated with the care of plaintiffs' adult son, Michael Hoover. Michael was injured as a child more than 20 years ago when struck by a motor vehicle operated by a drunk driver and insured by defendant. Defendant also challenges the trial court's assessment of attorney fees and penalty interest. The trial court did not properly apply, in part, our Supreme Court's opinion in *Griffith v State Farm Mut Automobile Ins Co*, 472 Mich 521; 697 NW2d 895 (2005), resulting in erroneous conclusions on several, but not all, of the expenses and services at issue. Further development of the record under the framework set forth in *Griffith* is appropriate with respect to expenses and services analyzed incorrectly by the court. Accordingly, we affirm in part, reverse in part, and remand for further proceedings.

In 1985, Michael Hoover, two years old at the time, was struck by a drunk driver and suffered serious, life-altering injuries. Michael, now 25, is developmentally disabled from a brain injury and is a quadriplegic, and he depends on a ventilator to breathe, all as a result of the accident. In 2002, plaintiffs built a new home with a wing specifically constructed and designed to accommodate Michael and his injuries. Alarms monitor Michael's breathing, in-home nurses working shifts around the clock provide medical care,

he is fed puréed food (sometimes through a feeding tube), a backup generator is in place in case of a disruption in power, Michael stays and sleeps in a specialized bed, the home has an elevator for when he needs to be moved to the basement, and Michael lives in a sterile environment closely surrounded by various medical instruments and equipment. See the photograph appended to this opinion. It is beyond dispute that absent these accommodations and the care of his parents and others, Michael would need to be institutionalized.

The parties have litigated the payment of PIP benefits off and on over the years, dating back to 1986, when plaintiffs first commenced suit for the recovery of benefits. Defendant's general obligation to provide PIP benefits was settled early in the litigation, and the court has adjusted the amount of benefits payable for home-care and living expenses through the years. In 2002, plaintiffs built a specially designed house with accommodations necessary to properly care for Michael. Pursuant to a settlement agreement, defendant paid approximately 28 percent of the construction costs. Thereafter, and on the basis of language in the agreement, defendant filed a motion requesting an order canceling future benefit payments for accommodations; however, the trial court denied the motion, and that ruling is not the subject of this appeal. Subsequently, plaintiffs moved for an increase in benefits to cover home-care and living expenses, and defendant, in response, argued that there should be a reduction. The trial court ruled that 28 percent of the home could be attributed to Michael's needs. Using this allocation, the trial court ordered defendant to pay benefits covering 28 percent of the following expenses: real estate tax bills, gas and electric utility bills, homeowner's insur-

ance, home maintenance,[1] telephone bills, and security system costs. The court ordered defendant to pay 100 percent of the expenses associated with the gasoline backup generator, dumpster, medical alert pendant, television monitoring system, and inspections of the elevator. The trial court additionally ordered defendant to pay plaintiffs $15 an hour for the two hours a day generally spent cleaning Michael's section of the home, removing trash, waxing floors, and removing snow from the driveway. The trial court further ruled that plaintiffs were entitled to penalty interest under MCL 500.3142 and reasonable attorney fees under MCL 500.3148.

Whether a cost constitutes an allowable expense under MCL 500.3107(1)(a) is a question of statutory construction, subject to review de novo. *Griffith,* 472 Mich at 525-526. We review underlying factual findings for clear error. *Ross v Auto Club Group,* 481 Mich 1, 7; 748 NW2d 552 (2008). "A trial court's finding of an unreasonable refusal to pay or delay in paying benefits will not be reversed on appeal unless the finding is clearly erroneous." *Attard v Citizens Ins Co of America,* 237 Mich App 311, 316-317; 602 NW2d 633 (1999). Our primary task in construing a statute is to discern and give effect to the intent of the Legislature. *Shinholster v Annapolis Hosp,* 471 Mich 540, 548-549; 685 NW2d 275 (2004). The words contained in a statute provide us with the most reliable evidence of the Legislature's intent. *Id.* at 549.

In *Reed v Citizens Ins Co of America,* 198 Mich App 443; 499 NW2d 22 (1993), overruled by *Griffith,* this Court, in an opinion I authored, addressed a claim for

---

[1] The court included within this cost the expenses associated with the well, septic system, roof, structural upkeep of the home, and general maintenance and repair.

no-fault insurance benefits under MCL 500.3107(1)(a).[2] In *Reed*, a parent sought no-fault insurance coverage for room and board expenses associated with the care of her son after he was severely injured in an automobile accident and came to live with her. He required 24-hour nursing care. The son initially spent 2½ years in residential treatment facilities following the accident. *Id.* at 445. The *Reed* panel, after first observing that "family members may be compensated for the services they provide at home to an injured person in need of care," ruled:

> We see no compelling reason not to afford the same compensation under the act to family members who provide room and board. [MCL 500.3107(1)(a)] does not distinguish between accommodations provided by family members and accommodations provided by institutions, and we decline to read such a distinction into the act. Moreover, holding that accommodations provided by family members is an "allowable expense" is in accord with the policy of this state. Denying compensation for family-provided accommodations while allowing compensation in an institutional setting would discourage home care that is generally, we believe, less costly than institutional care. . . .
>
> We hold that, where an injured person is unable to care for himself and would be institutionalized were a family member not willing to provide home care, a no-fault insurer is liable to pay the cost of maintenance in the home. [*Id.* at 452-453 (citations omitted).]

We are of the opinion that *Reed* was correctly decided and that it honored the language in MCL 500.3107(1)(a). We note that the Supreme Court, without dissent, denied the application for leave to appeal in

---

[2] MCL 500.3107(1)(a) provides that PIP benefits are payable for "[a]llowable expenses consisting of all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation."

*Reed*, 444 Mich 964 (1994), and the opinion stood and was accepted for 12 years until being overruled by a four-to-three decision in *Griffith*.[3]

In *Griffith*, the plaintiff's husband, Douglas Griffith, was involved in a motor vehicle accident, resulting in a severe brain injury and leaving him confined to a wheelchair. He was first treated at in-patient facilities and hospitals for two years before returning home with the plaintiff, where he required assistance with basic tasks such as bathing and eating. The insurer denied the plaintiff's claim to recoup her husband's food expenses under MCL 500.3107(1)(a) that were incurred after he returned home. *Griffith*, 472 Mich at 524-525. Relying on the language in MCL 500.3105(1)[4] and MCL 500.3107(1)(a), the Supreme Court rejected the plaintiff's claim for no-fault benefits. With respect to MCL 500.3105(1), the Court construed the language to mean that "a no-fault insurer is liable to pay benefits only to the extent that the claimed benefits are causally connected to the accidental bodily injury arising out of an automobile accident." *Id.* at 531. The Court concluded that the plaintiff's claim did not indicate that her husband's diet was different from the diet of an uninjured person, that the food expenses were incurred as part of a treatment plan, or that the food costs were related in any way to the injuries suffered in the accident. *Id.* Therefore, according to the *Griffith* Court,

---

[3] We encourage our Supreme Court to revisit and reconsider its decision in *Griffith*. See *People v Mitchell*, 428 Mich 364, 370; 408 NW2d 798 (1987) (stating that the Court of Appeals may properly express its belief that a Supreme Court opinion was incorrectly decided).

[4] MCL 500.3105(1) provides, in pertinent part, that "[u]nder personal protection insurance an insurer is liable to pay benefits for accidental bodily injury arising out of the ownership, operation, maintenance or use of a motor vehicle as a motor vehicle . . . ."

the claimed food expenses were not for, nor causally connected to, an accidental bodily injury. *Id.* at 532.

Proceeding on an assumption that the food expenses could be compensated under MCL 500.3105(1), the Supreme Court then examined and rejected the plaintiff's claim under MCL 500.3107(1)(a). The Court first noted that there was no contention that the food expenses were part of the plaintiff's husband's "recovery" or "rehabilitation," as those terms are used in MCL 500.3107(1)(a), thereby narrowing the issue to whether the food expenses were necessary for his "care." *Griffith,* 472 Mich at 532-533. Addressing the interpretation of the term "care" as used in MCL 500.3107(1)(a), the Court stated:

> "Care" must have a meaning that is broader than "recovery" and "rehabilitation" but is not so broad as to render those terms nugatory. As noted above, both "recovery" and "rehabilitation" refer to an underlying injury; likewise, the statute as a whole applies only to an "injured person." It follows that the Legislature intended to limit the scope of the term "care" to expenses for those products, services, or accommodations whose provision is necessitated by the injury sustained in the motor vehicle accident. "Care" is broader than "recovery" and "rehabilitation" because it may encompass expenses for products, services, and accommodations that are necessary because of the accident but that may not restore a person to his preinjury state. [*Id.* at 535.]

The *Griffith* Court, applying its definition of "care," proceeded to analyze the claim for food expenses pursued by the plaintiff:

> Griffith's food costs here are not related to his "care, recovery, or rehabilitation." There has been no evidence introduced that he now requires different food than he did before sustaining his injuries as part of his treatment plan. While such expenses are no doubt necessary for his *sur-*

*vival,* they are not necessary for his recovery or rehabilitation from the injuries suffered in the accident, nor are they necessary for his care because of the injuries he sustained in the accident. Unlike prescription medications or nursing care, the food that Griffith consumes is simply an ordinary means of sustenance rather than a treatment for his "care, recovery, or rehabilitation." In fact, if Griffith had never sustained, or were to fully recover from, his injuries, his dietary needs would be no different than they are now. We conclude, therefore, that his food costs are completely unrelated to his "care, recovery, or rehabilitation" and are not "allowable expenses" under MCL 500.3107(1)(a). [*Id.* at 535-536 (emphasis in original).]

The Court, rejecting the plaintiff's argument that there was no difference between food costs for hospital food and the cost of food provided to an insured as part of at-home care, reasoned:

Food costs in an institutional setting are "benefits for accidental bodily injury" and are "reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation." That is, it is "reasonably necessary" for an insured to consume hospital food during in-patient treatment given the limited dining options available. Although an injured person would need to consume food regardless of his injuries, he would not need to eat *that particular food* or bear the cost associated with it. Thus, hospital food is analogous to a type of special diet or select diet necessary for an injured person's recovery. Because an insured in an institutional setting is required to eat "hospital food," such food costs are necessary for an insured's "care, recovery, or rehabilitation" while in such a setting. Once an injured person leaves the institutional setting, however, he may resume eating a normal diet just as he would have had he not suffered any injury and is no longer required to bear the costs of hospital food, which are part of the unqualified unit cost of hospital treatment.

*This reasoning can be taken a step further when considering the costs of items such as an injured person's clothing,*

*toiletries, and even housing costs. Under plaintiff's reason-*
*ing, because a hospital provided Griffith with clothing*
*while he was institutionalized, defendant should continue*
*to pay for Griffith's clothing after he is released. The same*
*can be said of Griffith's toiletry necessities and housing*
*costs. While Griffith was institutionalized, defendant paid*
*his housing costs. Should defendant therefore be obligated*
*to pay Griffith's housing payment now that he has been*
*released when Griffith's housing needs have not been af-*
*fected by his injuries?* [*Id.* at 537-539 (emphasis in final
paragraph added).]

It is crucially important for our purposes here to keep
in mind all the language in the rhetorical question
regarding housing needs posed in this passage from
*Griffith,* which demands a determination whether the
housing needs at issue are "affected by [one's] injuries."
*Griffith* expressly overruled *Reed* on the basis that the
rule announced in *Reed* was contrary to MCL
500.3105(1) and MCL 500.3107(1)(a). *Id.* at 540. As
indicated earlier, the rule announced in *Reed* was that
in cases "in which an injured person is unable to care
for himself and would be institutionalized were a family
member not willing to provide home care, a no-fault
insurer is liable to pay the cost of maintenance in the
home." *Reed,* 198 Mich App at 453. However, consistent
with *Griffith* and its language addressing housing needs
unaffected by injuries, room and board or living ex-
penses are not necessarily precluded from being covered
by insurance benefits in their entirety in every case,
such as when the expenses, because of or as affected by
the injuries, go beyond or are different from what
normally could be expected.[5] *Reed* in no way indicated

_____

[5] We note that *Griffith* indicated that if Mr. Griffith had been required
to eat special diet food, no-fault benefits would have covered those food
costs. *Griffith* did not have to address whether there would have needed
to be any adjustments in benefits on consideration of the cost of the diet
food when compared to the cost of ordinary food. For example, if it cost

that the claimed room and board or living expenses were atypical, unusual, or out of the ordinary; rather, they were ordinary expenses typically associated with living in the home. *Id.* at 446 (trial court stated that benefits would not be recoverable because the "expenses would have been incurred regardless of the injury sustained"), 450 n 3 (proposed amended complaint sought reasonable accommodation expenses), and 453 (Court disagreed that "expenses that are as necessary for uninjured persons as they are for injured persons are not allowable expenses").

At its core, the holding in *Griffith* requires a court to determine whether expenses would not have been incurred *but for* the accident and resulting injuries. Stated otherwise, the question is whether the expenses would have been incurred in the course of an ordinary life unmarred by an accident. And if they would have been incurred, like the ordinary food costs at issue in *Griffith*, a causal connection between the expenses and the accidental bodily injury would be lacking and it could not be said that the act of providing products, services, and accommodations was necessitated by the accidental bodily injury. No-fault benefits would not be payable absent a link between the expenses and the injury. But if the expenses were atypical and arose solely because or out of the accidental bodily injury, a causal connection between the expenses and the injury would exist and it could be said that the act of providing products, services, and accommodations was necessitated by the accidental bodily injury. Payment of no-fault benefits to cover the expenses would be mandated in that situation.

---

$15 a day to feed a person preinjury, and if the daily cost of food on a special diet following the accident were still $15 a day, would a $15 daily no-fault benefit have to be paid or would no benefit be owing? *Griffith* suggests that a $15 benefit would still need to be paid.

The analysis necessarily entails a comparison between costs associated with circumstances as they actually exist, which includes reflection on a life scarred and affected by injuries sustained in an automobile accident, and costs associated with a life unscarred by injuries, which would include examination of circumstances that existed preinjury or that would in all likelihood have transpired absent the injury. Whether injured or uninjured, Michael would need, like each of us, daily sustenance and housing, thereby incurring all associated costs. The concept that defendant fails to grasp is that, even though Michael or his parents would have borne expenses for Michael's necessities had Michael not been injured, the expenses currently being incurred as a result of his injuries are, in all likelihood, more than would ordinarily have been incurred in an accident-free life.

An initial question that begs asking as part of the "but for" analysis concerns whether you take into consideration the fact that it is Michael's parents who are providing "services" and "accommodations" to Michael. Consistent with Supreme Court's tendency to use dictionaries to determine the plain meaning of statutory terms undefined in the statutory scheme, *People v Morey*, 461 Mich 325, 330-331; 603 NW2d 250 (1999), "accommodations" is defined as "lodging" or "food and lodging" and services encompass "act[s] of helpful activity . . . ." *Random House Webster's College Dictionary* (2001). Given that Michael is 25 years old, plaintiffs are not under any legal obligation as parents to pay for his food, lodging, accommodations, support, or services or to otherwise pay for his care. See generally the Support and Parenting Time Enforcement Act, MCL 552.601 *et seq*. Had Michael not been injured and were he a healthy 25-year-old man, plaintiffs would likely not be providing any accommodations and ser-

vices for him and, at a minimum, they absolutely would have no legal obligation to so provide.

A medical or nursing home facility that provides institutionalized care is likewise not obligated to provide accommodations and services, but once an undertaking is made and a patient is admitted under contract, accommodations and services are provided, as well as products, and the no-fault insurer is required to pay benefits to cover the associated costs. However, under the analysis in *Griffith*, especially considering its rejection of *Reed*, a case with many parallels to the case at bar, it appears that parents providing accommodations and services for an injured adult child, although under no legal obligation to do so, are not afforded no-fault insurance benefits to the full extent of the accommodations and services provided. This is so despite the fact that, in our opinion, there is indeed a causal connection between the accidental bodily injury and the accommodations and services. Again, plaintiffs are providing Michael with accommodations and services, which, but for the accident, they would likely no longer be providing, given his age. But in contemplating whether an expense for a particular item would have been incurred even without the accident, *Griffith* suggests that it matters not who would have incurred the expense in an accident-free life, just that it would have ordinarily been incurred.[6] Thus, for example, all costs attributable

---

[6] In *Griffith*, it was an elderly, married couple who sought insurance benefits for food costs. The couple would have together borne these costs regardless of the accident. The factual setting is different in this case because plaintiffs are caring for an adult child who, most likely, would otherwise be out on his own and bearing the costs of housing himself, although we cannot say that with 100 percent certainty. Ultimately, this distinction does not appear to be relevant under *Griffith*, especially given its treatment of *Reed*.

to Michael for utilities on the basis of his usage would not be recoverable because, had Michael not been injured, his activities would nonetheless have generated some level of expenses for utility usage regardless of who ultimately paid the utility bills. Under *Griffith*, an examination is required to discern the portion of the utility costs attributable to Michael that is causally connected to his injuries, which would be utility usage that goes beyond typical or ordinary usage, i.e., usage *"affected by his injuries." Griffith,* 472 Mich at 539 (emphasis added). In other words, a court must allocate not the portion of a utility bill attributable to the injured person's usage, but that portion of the bill attributable to the injured person's usage that is only occurring because of the injuries, e.g., power to operate Michael's ventilator. Making these calculations and ascertaining the proper allocations might prove difficult; however, *Griffith* requires such an undertaking.

We now turn to the expenses for which plaintiffs seek no-fault benefits, applying the principles enunciated. It is important to first identify the expenses at issue and those not at issue in this case. Defendant concedes that Michael is in need of "24 hour per day nursing services, widened hallways and elevators . . . , wheelchairs, ventilators, specially equipped beds, and other such amenities that [he] needs as a result of the injuries" and that "[s]uch expenses are causally related to [the] automobile accident and are covered under no-fault insurance." Defendant also concedes that the expenses associated with the backup generator should be and are fully covered by insurance, as are television monitoring and medical alert pendant expenses. Defendant challenges, however, the awarding of insurance benefits to cover, even partially, property taxes, standard utility bills, homeowner's insurance, home maintenance costs, telephone bills, dumpster expenses, elevator inspection

costs, home security system expenses, cleaning stipends paid to Mrs. Hoover for time spent cleaning Michael's area of the home, and snow removal.

It is necessary to carefully scrutinize the expenses at issue and take into account factors that have a bearing on those expenses.

With respect to property taxes, it is indisputable that plaintiffs' property taxes are affected by the value of the home, see the General Property Tax Act, MCL 211.1 *et seq.*, and it is likely that the value of the home is enhanced by certain structures and amenities therein, architectural designs, and square footage that are causally connected to, and necessitated by, Michael's accidental bodily injuries, thereby inflating the amount of property taxes owed. In regard to homeowner's insurance, it is again, in our opinion, indisputable that premiums paid for that insurance are affected by the value of the home, which in turn is affected by the home's structural design, amenities, and square footage, some of which are attributable to Michael's injuries, and the home's features in and of themselves can affect the insurance premiums. With respect to maintenance costs, some portion of those costs are likely to be causally connected to, and necessitated by, Michael's injuries, going beyond ordinary maintenance expenses related to housing a healthy adult child, when many features of the home are atypical in order to suit Michael's needs. On the issue of the utility bills, touched on earlier, they are likely higher than would normally be expected, considering the extra electricity needed to power, for example, the ventilator. If Michael were a healthy young man living in his parents' home, there would be no extra cost to power a ventilator. Additionally, the mere size of the home, some of which can be attributed to features needed to accommodate

Michael, would have a bearing on the cost to heat the home. We agree with defendant that plaintiffs would be required to pay taxes, utilities costs, homeowner's insurance premiums, and maintenance expenses irrespective of Michael's injuries; however, these costs are certainly inflated beyond what would normally be expected because of Michael's accidental bodily injuries.

With respect to the ADT security system, Mr. Hoover indicated that it is used for crime prevention and to help the nurses feel safer. Given that nurses would be unnecessary but for the accident and considering that the home contains expensive medical equipment related to Michael's care, it could be surmised that some of the costs associated with the security system are causally connected to, and necessitated by, Michael's accidental bodily injuries. We would also not be surprised if the cost of the system is greater because of the immense size of the home necessitated by features constructed to properly care for Michael. Furthermore, Mr. Hoover testified that a "panic button" for Michael was part of the ADT security system and included in the monthly bill for the system.

In regard to elevator inspection costs, the fact that plaintiffs' house even has an elevator is directly connected to, and necessitated by, Michael's injuries and, therefore, inspection and operational expenses can also be attributed to accidental bodily injury. Indeed, as quoted earlier, defendant concedes that Michael is in need of "widened hallways and elevators." Michael's need for basement access during weather emergencies by means of an elevator specifically arises because of his injuries, and defendant apparently believes that Michael has another means to access the basement during a tornado or other weather emergency or that he need not be given a safe haven. Defendant's position is

necessarily and implicitly premised on the illogical conclusion that plaintiffs would have had an elevator in their home had Michael never been injured. Furthermore, Mr. Hoover testified that a doctor ordered the elevator, and he also stated that the elevator is used to give Michael access to the basement when the family gathers down there to watch television or otherwise spend time together socially. Inspecting the elevator is a normal safety precaution, and associated costs are covered by no-fault benefits.

With respect to the dumpster, Michael alone generates numerous bags of garbage a day because of the nature of his injuries and their attendant care, which goes beyond the amount of garbage that would typically be generated by an adult child who is not afflicted with the injuries suffered by Michael. Mr. Hoover testified that most of the garbage that goes into the dumpster is generated by Michael and that without a dumpster, garbage would pile up all over the place and blow into the street.[7] Absent Michael's injuries, no dumpster would be necessary. At first glance, allocating the full amount of the dumpster cost to Michael would appear improper because plaintiffs also use the dumpster for their waste and, even if injury-free, Michael would generate some waste. However, this issue is somewhat analogous to the food expense issue in *Griffith*. Just as daily sustenance can be accomplished by eating an ordinary diet or a special diet, garbage removal can be accomplished by using a standard trash can set out at the curb or by use of a dumpster, something typically relegated to use by restaurants and businesses because of the quantity of waste generated. Consistent with our

---

[7] Mr. Hoover stated that "you could get a pickup truck load in one day of Michael's stuff . . . ." He testified that about 80 percent of the garbage in the dumpster comes from Michael.

thoughts expressed in footnote 5 of this opinion, *Griffith* indicates that special diet food would be a fully covered expense regardless of how it compares to the cost of daily sustenance ordinarily incurred. *Griffith,* 472 Mich at 537-538. Thus, even though some garbage removal costs can be attributed to plaintiffs, along with costs Michael would have ordinarily incurred in an accident-free life, the dumpster, like special diet food, is fully covered because it was necessitated by accidental bodily injury.

On the issue of benefits to cover stipends for Mrs. Hoover related to cleaning Michael's living area, parents of a healthy adult child might clean up after the child, they might make the child clean up after himself, or the parents and child might share the cleaning duties. What is abundantly clear here is that Michael's incapacity does not allow him to clean up after himself and that the needed cleaning goes beyond cleaning that would ordinarily be expected.[8] Part of Mrs. Hoover's cleaning time is spent taking care of messes created as the nurses provide care for Michael, which, but for the accident, would not be necessary. She also testified that she cleans daily to make sure that Michael's room is "dust free," which is understandable given Michael's susceptibilities to infection or illness. We conclude that Mrs. Hoover is entitled to be compensated for any time spent cleaning areas used by Michael and his caregivers that goes beyond the time for cleaning that one would ordinarily expect to perform. With respect to snow removal costs, Mr. Hoover testified that part of the need to clear the driveway as often as it is done is because of

---

[8] "[W]e long ago recognized that family members should be compensated for the services they provide at home to an injured person in need of care." *Bonkowski v Allstate Ins Co*, 281 Mich App 154, 167; 761 NW2d 784 (2008).

the fact that shift nurses are coming and going around the clock and ingress or egress is required. Any costs greater than those that would regularly be spent on snow removal are to be attributed to Michael's needs.

In regard to telephone bills, the evidence was unclear, such that we cannot render any assessment of the issue.

We conclude that a remand is proper for the parties to submit additional evidence on each of the expenses remaining at issue in order to give them an opportunity to properly present arguments under the analytical framework outlined here and as required by *Griffith*. At the time of the hearing on plaintiffs' motion to increase benefits, during which the parties and court agreed to have the case decided on documentary evidence submitted to the court, *Griffith* had not yet been decided. Moreover, the approach taken by *both* parties was to have the court simply allocate the expenses, across the board, on the basis of the percentage of the home devoted to Michael's use, which would then be multiplied by the particular bill covering the entire home. The parties disagreed on the percentage of the home devoted to Michael's use, and that was the focus during much of the litigation below. Plaintiffs did indeed submit bills, statements, and other evidence of the expenses. We conclude that remand for further development of the record under *Griffith* guidelines is proper.

We do agree with defendant that the 28 percent allocation ordered by the trial court was not legally sound, and it is inconsistent with our analysis, although the court's decision was understandable from a practical standpoint considering the difficulties in making technical allocations for each item of cost and the desire to simplify matters. Despite the difficulties in making the necessary assessments, we reverse with respect to the expenses that were given a 28 percent allocation

and remand the case to the trial court in order for the court to entertain additional evidence relevant to the approach dictated by *Griffith* and to rule accordingly. For purposes of the remand, we emphasize that although this opinion indicates that there is a likelihood that the various expenses at issue are causally connected to Michael's injuries to some degree, the trial court is to render its own judgment on each expense on the basis of the evidence presented. On the claimed expenses for which the trial court awarded 100 percent of the costs, we find no error in regard to the backup generator, television monitoring system, medical alert pendant, elevator inspections, and dumpster. Thus, we affirm that part of the trial court's ruling. With respect to the cleaning services performed by Mrs. Hoover and the snow removal expenses, no-fault benefits are owing only if the snow removal and time spent on cleaning are causally connected to Michael's injuries, which matters the trial court must resolve on remand.

On the issue of attorney fees, defendant did unreasonably refuse to pay or delay payments of benefits for expenses associated with the backup generator, television monitoring system, medical alert pendant, dumpster, and elevator inspections. Thus, attorney fees are recoverable to the extent that they relate to benefits for those claimed expenses. MCL 500.3148(1); *Attard,* 237 Mich App at 317. Penalty interest under MCL 500.3142(2) is also appropriate with respect to those same items. *Attard,* 237 Mich App at 319-320. The other items of expense need further review before deciding the appropriateness of additional attorney fees and penalty interest. At this time, we see no basis to award defendant attorney fees under MCL 500.3148(2) for a foundationless excessive or fraudulent claim on plaintiffs' part. To the extent that our conclusions on attor-

ney fees and penalty interest are consistent with the trial court's order, we affirm.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

FITZGERALD, J., concurred.

SCHUETTE, P.J. (*concurring in part and dissenting in part*). I concur in the conclusion reached by my distinguished colleagues, Judges MURPHY and FITZGERALD, that the 28 percent allocation ordered by the trial court was not legally sound and was arbitrary. I also concur that there is no basis for awarding defendant attorney fees because plaintiffs' claims were not fraudulent.

I respectfully dissent, however, from the majority's expansive application of *Griffith v State Farm Mut Automobile Ins Co*, 472 Mich 521; 697 NW2d 895 (2005), to this case. I do not believe that plaintiffs are

entitled to payment of benefits for any costs other than those for the backup generator, television monitoring system, and medical alert pendant service. I also respectfully dissent from the majority's determination that defendant unreasonably refused to pay or delayed payment of benefits for any costs other than those for the generator, television monitoring system, and medical alert pendant service. Therefore, I would reverse and remand for recalculation of the awards to which plaintiffs are entitled.

Under the *Griffith* Court's interpretation of MCL 500.3105(1) and 500.3107(1)(a), an insured's housing costs are compensable if they are affected by accidental injuries arising out of the operation of a motor vehicle and are reasonably necessary for the insured's "care, recovery, or rehabilitation." *Id.* at 530.

At the outset, I agree with the majority that the trial court erroneously allocated 28 percent of the cost of plaintiffs' home as directly related to Michael's custody and care. In arriving at 28 percent, the trial court relied on the parties' agreement on accommodations and found that defendant had contributed $200,000 toward construction costs of the handicap-accessible home—or roughly 28 percent of the total cost of the $700,000 home. However, this figure merely represents a settlement agreement between the parties regarding defendant's contribution to construction costs for "any and all accommodations reasonably necessary for Michael Hoover's care, recovery and rehabilitation." The fact that nearly 28 percent of the construction costs related to accommodations for Michael does not mean that 28 percent of the home is apportioned to Michael or that care related to Michael's injury constitutes 28 percent of the cost of certain items for which the court awarded benefits. Similarly, despite plaintiffs' assertion that 28

percent is the proper apportionment because Michael uses 2,000 square feet of the 7,200-square-foot home, the amount of space Michael uses cannot alone account for the apportionment of the home related to care for his injuries that resulted from the accident. Indeed, Michael would require space to live in a house regardless of the injuries he sustained in the accident. In other words, the expense of living in a house is not, by itself, causally related to the injuries at issue. Consequently, the trial court improperly attributed 28 percent of the home to Michael's needs.

Given this, the court's awards apportioned at 28 percent were arbitrary. First, the award of 28 percent of plaintiffs' real estate taxes in no way accounts for the home's appraisal value. The fact that defendant contributed 28 percent of the cost of the home does not explain the extent to which facilities constructed for care of Michael's injuries caused by the accident affected the tax appraisal. Second, no evidence was presented concerning the percentage of plaintiffs' utility bills, maintenance costs (including those for a water softener, well, septic system, the roof, structural maintenance, and general maintenance and repair), and telephone bills that are attributable to Michael's care necessitated by his injuries. Indeed, irrespective of his injuries, plaintiffs would be required to pay taxes, utilities, maintenance costs, and telephone bills.

Further, allocation of 28 percent of the security system expenses and homeowners insurance to defendant was wholly improper. Regarding the security system, Rodney Hoover testified that this system is used for crime prevention and helps Michael's nurses feel safer. The system is not reasonably necessary for

Michael's care, recovery, or rehabilitation.[1] Similarly, homeowner's insurance is completely unrelated to Michael's care, recovery, or rehabilitation. Again, plaintiffs would bear the cost of that insurance irrespective of his injuries.

Moreover, the trial court improperly awarded plaintiffs 100 percent of the costs of the dumpster, elevator maintenance, Maxine Hoover's cleaning, and snow removal. First, although Michael generates two to three bags of garbage a day, the court's finding that the dumpster is "solely for Michael's waste" was clearly erroneous given Rodney's testimony that this expense covers waste removal for the entire household, as well as testimony that use of the dumpster is also necessitated by the fact that the house is 2,500 feet from the road. Use of the dumpster is not reasonably necessary for Michael's care, recovery, or rehabilitation. Second, regarding the elevator maintenance costs, although Rodney testified that the elevator permits Michael access to the basement in the event of a weather emergency, the need for access to a basement because of weather conditions is not causally related to Michael's injuries. Third, while Maxine explained that she performs "serious" daily cleaning of Michael's room (including vacuuming, mopping and sweeping floors, and cleaning the tub, walls, and windows), evidence was not presented that this cleaning is causally related to Michael's injuries. Further, Maxine admitted that a portion of her cleaning results from the mess left by Michael's nurses. Moreover, removing snow from a driveway is completely unrelated to the injuries at

---

[1] Rodney testified that the ADT security system was used predominantly to "keep an eye on Michael." However, in context, it appears that Rodney was referring to the television monitoring system, also provided by ADT. Defendant does not dispute the court's award for that expense.

issue. Indeed, plaintiffs would need to remove snow from the driveway irrespective of Michael's injuries. Consequently, the only benefits I find the trial court properly awarded were those for the backup generator, television monitoring system, and medical alert pendant services.

Further, I agree with defendant that the court erred in awarding plaintiffs attorney fees and penalties and in failing to address defendant's request for attorney fees.

> The no-fault act provides for attorney fees when an insurance carrier unreasonably withholds benefits. The trial court's decision about whether the insurer acted reasonably involves a mixed question of law and fact. What constitutes reasonableness is a question of law, but whether the defendant's denial of benefits is reasonable under the particular facts of the case is a question of fact. [*Ross v Auto Club Group*, 481 Mich 1, 7; 748 NW2d 552 (2008).]

A trial court's award of interest under the no-fault statute is reviewed de novo. *Attard v Citizens Ins Co of America*, 237 Mich App 311, 319; 602 NW2d 633 (1999).

Under MCL 500.3148(1), an attorney representing a claimant may recover fees when an insurer's personal protection insurance benefits payment is overdue, and the fee "shall be a charge against the insurer in addition to the benefits recovered, if the court finds that the insurer unreasonably refused to pay the claim or unreasonably delayed in making proper payment." "When determining whether attorney fees are warranted for an insurer's delay to make payments under the no-fault act, a delay is not unreasonable if it is based on a legitimate question of statutory construction, constitutional law, or factual uncertainty." *Attard, supra* at 317.

With the exception of payments that defendant concedes plaintiffs legitimately claimed (i.e., payments for

the generator, television monitoring system, and medical alert pendant service), defendant did not unreasonably delay payments. Indeed, as noted earlier, factual uncertainty existed regarding the 28 percent apportionment of the house as directly related to care for Michael's injuries. Additionally, plaintiffs were not entitled to benefits for the costs of the security system, homeowner's insurance, the dumpster, elevator maintenance, Maxine's cleaning, and snow removal. Thus, I believe that the trial court should recalculate attorney fees with respect to the items that defendant conceded were appropriate.

Defendant also contends that the trial court erred in awarding plaintiffs interest under MCL 500.3142(2). I agree in part. "[T]he no-fault interest statute requires an insurer to pay simple interest of twelve percent for personal protection insurance benefits that are not paid within thirty days 'after an insurer receives reasonable proof of the fact and of the amount of loss sustained.' " *Attard, supra* at 319, quoting MCL 500.3142(2). "[N]o-fault interest is intended to penalize an insurer that is dilatory in paying a claim." *Attard, supra* at 319. As noted earlier, defendant was only dilatory in providing benefit payments for the generator, television monitoring system, and medical alert pendant service after notice was provided within the statutory time frame. Whether defendant owed additional payments was, at best, uncertain. Thus, interest was only appropriate for late payment regarding these items.

I would reverse and remand for the trial court to award costs and recalculate attorney fees and penalties.